Nott, J.,
delivered the opinion of the court:
The counsel for the claimant insists that the facts in this case are substantially identical with those in La Peyre's Case, (8 C. Cls. R., p. 165,) and that the decision of this court must necessarily follow that of the Supreme Court in that case. The counsel for the defendants is understood to concede the substantial identity of the facts, but to insist that the legal ground upon which the defense is now placed was not taken by the defendants’ counsel in the case of La Peyre, and probably escaped the attention of the Supreme Court when deciding that case.
The former case singularly divided two courts, and was ordered to be re-argued on the same point in each. That point involved a determination of the time when the Proclamation June 24,1865, (13 Stat. L., p. 769,) took effect — a proclamation which terminated restrictions upon commercial intercourse in the insurrectionary districts, and virtually brought the Won-intercourse Act (12 Stat. L., p. 257) to an end. The immediate question before the two courts was whether a proclamation takes effect on the day of its date or on the day of its publication ; but the ultimate question which concerned the case, and determined the decision, was whether restrictions, upon commercial intercourse had ceased at New Orleans on the 24th of June, 1865 — the day when the transaction between the claimant and the Government was consummated. ■ Upon the former question, four judges of the Court of Claims, after re-argument, stood equally divided, and judgment pro forma for the purposes of an appeal was rendered against the claimant. In the Supreme Court also,'after re-argument, five judges were for reversal and four for affirmance, and the judgment was accordingly reversed, with instructions to enter a judgment in favor of the claimant.
For the better understanding of the significance of this judgment of reversal, we now advert to the law and facts upon which the former case went up.
The non-intercourse enjoined by the Act 13 July, 1861, (12 Stat. L., p. 237,) was to continue only so long as hostilities existed, and was to end whenever the President by proclamation should declare that they had ended. Within the general *677 rule of non-intercourse there was, nevertheless, allowed an exceptional restricted commercial intercourse which was regulated, so far as these cases were involved, by the Act 2 July, 1864, (13 Stat. L., p. 375, § -8,) and the Treasury Regulations, 9th May, 1865. The effect of the existing statutes and regulations was that cotton could not be brought into New Orleans except upon the payment of a bonus for the right thus to trade, which bonus was one-fourth of the cotton or of its value. In some instances, as in La Peyre’s Case, the bonus was paid in kind, by the actual retention of one-fourth of the cotton; in others, as in the case now before us, the payment was madein cash. In either case the form of the transaction was by a sale and resale of the cotton. Thus the owner here sold the cotton to the Treasury agent at a nominal consideration of $9,625.98, and the Treasury agent immediately sold it back to the owner at a nominal consideration of $12,834.64, and the owner thereupon paid the difference, viz, $3,208.66, the sale and resale constituting in fact but one transaction. It is to be noted that at the time of this transaction the cotton was in the possession or under the control of the agent, and that an owner or importer could obtain control and possession only by going through the form of this transaction and paying the bonus which the regulations imposed. On the other hand, it is also to be noted that the cotton thus sold and resold was thereby freed from the payment of “all fees” and internal-revenue “taxes.”
When the case of La Peyre came up for consideration, it is apparent that two primary questions were involved, both of which must have been determined before it could have become necessary for the Supreme Court to proceed to the determination of the vexed and doubtful question of the proclamation. First, if the regulations were illegal and imposed no valid restriction upon this commercial intercourse, it was manifestly needless to determine whether they were abrogated on the 24th of June by the proclamation. This court in Block's Case (8 C. Cls. R., p. 461) expressed this opinion as to the action of the Supreme Court in La Peyre’s Case, and that court has more recently held, in McClelland's Case, (10 C. Cls. R., p. 68,) that kindred regulations affecting this species of traffic were lawful and obligatory. The second of these primary questions was whether La Peyre had a case which could be sustained upon his own theory of the law — whether he could recover back the money *678 paid into the Treasury if the restrictions upon commercial intercourse were, as he claimed, at an end. For, unless this primary question was determined in favor of La Peyre, manifestly it was needless to order a re-argument upon what was only a resulting question — the time when the proclamation took effect — the time when restrictions upon commercial intercourse ceased.
It is true that a primary question of this character is sometimes overlooked by a court when it has not been discussed at the bar, but in view of the protracted consideration which the case of LaPeyre received, and the unusual pains bestowed upon it by the Supreme Court, we do not feel warranted in ascribing any such oversight to the deliberations of that tribunal. Apart from the factof are-argument, there was also the important circumstance of a nearly equally divided court. Four of the nine judges thought that the claimant should not recover, but they rested their dissent exclusively upon the effect to be given to the proclamation. Upon all other points and questions the members of the court stood unanimous in his favor. The concurrence of the minority as to the primary rights of La Peyre is thus announced in the dissenting opinion of Mr. Justice Hunt:
“If it [the proclamation] had vitality or existence on the24th day of June, the Government agent had no authority to retain the one hundred and nineteen bales of cotton by virtue of the law of 1864. If it had not existence on that day, he had authority, and the present claim is without foundation.”
The counsel for the defendants places the defense of this case upon the general rule that a voluntary payment made in mutual mistake of law cannot be recovered back. As to the rule there can be no question; but whether the payment in this case was in legal effect voluntary is by no means free from doubt. The claimant’s goods were in the possession of the Treasury agent; he, in the language of Mr. Justice Hunt, “ had no authority to retain ” them; yet he exacted a payment equal to one-fourth of their value as a condition to restoring them to the possession of the owner. In some cases it has been held that such a payment must be deemed to have been made under a moral duress, (Astley v. Reynolds, Str. R., 915; Close v. Phipps, 7 Mann. & Gr., 586; Shaw v. Woodcock, 7 Barn. & Cress., 73; Atlee v. Backhouse, 3 Mees. & Wels., 633; Oates v. Hudson, 6 Wels., H. & G., 346;) in others it has been held that the payment of an *679 illegal tax, or impost, or official charge is not voluntary, though no protest be made. (Adams’ Case, 1 C. Cls., R., p. 306; Boston & Sandwich Glass Co. v. City of Boston, 4 Met., 181; Amesbury Woolen Co. v. Inhabitants of Amesbury, 17 Mass., 461; Preston v. Boston, 12 Pick., 7; Ripley v. Gelston, 9 Johns., 201; Clinton v. Strong, id., 370; Steele v. Williams, 20 Eng. Law & Eq., 319.) In short, there is a current of authorities which hold (apart from some statutory requirement of protest at the time of payment) that a payment made to a public officer who has the power of compulsion behind him, or a jiayment exacted by an officer colore officii as a condition to the delivery of a man’s property, is never to be considered a voluntary act. As was -said by the court in one of these cases, (Clinton v. Strong,) “It would lead to the grossest abuse to hold a payment made under such circumstances a voluntary payment, precluding a party from contesting it afterwards.” And, as was said by Baron Martin in another, (Steele v. Williams:) “As to whether the payment was voluntary, that has in truth nothing to do. with the case; * * * to call it a voluntary payment is an abuse of language. * * * Where a party says, ‘I charge you such a sum by virtue of an act of Parliament/ it matters not whether the money is paid before or after the service- was rendered; if he is not entitled to claim it, the money may be recovered back.”
Therefore, without passing upon the applicability of the doctrine of involuntary payments exacted colore officii, there is abundant reason for saying that the Supreme Court might well have decided as it did, and that if any judicial inadvertence •existed, it is for the Supreme Court, and not this, to correct the error.
It is also said by the counsel for the Government that the owners receipt of their cotton freed from the payment of all “fees” and internal-revenue “taxes” constituted a sufficient consideration to support the transaction. But such was the fact in the case of La Peyre, and it would seem that if the Supreme Court really held that the Treasury agent had no authority to exact anything from the owner, his illegal conduct could not be cured by Ms relinquishing a portion of the exaction, though put in the guise of a release from -fees and- internal-revenue taxes. If the Government lost a tax by the transaction which it is entitled to receive, the.modern English case of De Lancey *680 v. The Queen (6 L. R. Exch., p. 286) is authority for saying that its right might have been asserted in this action by way of set-off.
A second cause of action is set up in the petition, viz, for the bonus exacted on other cotton brought in from the west banlc of the Mississippi before the proclamation restoring commercial' intercourse with territory on that side of the river had been issued. We think that demand is answered by the construction hereinbefore given to the decision of the Supreme Court in La Peyre’s Case, and by its decision in McClelland’s, (10 C. Cls. R., p. 68.)
The .judgment of the court is that the claimant recover $3,208.66, exacted from him on the 13th June, 1865, for cotton brought from the east bank of the Mississippi, and that his claim founded on cotton brought in on the same day from the-west bank of the Mississippi be dismissed.
Eichardson, J., was absent when the decision was announced,, but had taken part in the consideration of the case and agreed in the conclusion of the court.
Under the decision above rendered in the case of Norton, assignee of De Bow & Co., v. The United States, the following judgments were entered:
In the case of White & Montgomery v. The United States, judgment in favor of the claimants for $3,443.50.
In the case of J. R. Bonnafon v. The United States, judgment in favor of the claimant for $2,066.10.
In the case of Norton, assignee of B. P. Ethell, v. The United States, judgment in favor of the claimant for $3,856.72.