Nott, J.,
delivered the opinion of the court:
In 1862 the United States direct-tax commissioners for the State of South Carolina passed a resolution imposing a tax on all real property within the State. In 1865 they charged and. *607 received from the claimant interest on the tax for a period running from the President’s proclamation pf July 1, 1862, to the time of payment.
When the tax commissioners fixed the assessment of taxes in the State by their resolution of November 3,1862, they were in Beaufort, on one side of the military lines, and the claimant was, it may be assumed, in Charleston, on the other. At that time the tax commissioners and the party taxed were enemies of each other, and all business intercourse between them was forbidden both by international and statute law. It would have been unlawful for the owner in Charleston to have paid taxes across the lines, and it would have been unlawful for the commissioners to have received'them.
The Act 7th June, 1862 (12 Stat. L., p. 122, § 6, ch. 98), provided—
“ That the said board of tax commissioners shall enter upon the discharge of the duties of their office whenever the commanding general of the forces of the United States, entering into any such insurrectionary State or district, shall have established the military authority of the United States throughout any parish or district or county of the same.”
The statute therein harmonized with the law which regu lated commercial intercourse, and renders it manifest, we think, that the direct taxes could not have been fixed upon property in Charleston until the owners could have lawfully paid them and the commissioners lawfully received them. Charleston was'occupied by the forces of the government on the 17th February, 1865, and the commissioners again “fixed the amount of the tax” on property in Charleston by .their resolution of March 6. In the opinion of the court that was the first time that the amount of the tax was fixed within the true intent of the statute, the previous resolution of November 3d being operative certainly no further than the military lines extended. Hence the penalty of 10 per cent, interest exacted of the claimant from July 1,1862, was unauthorized by law.
The tax was paid without protest or objection, and the counsel for the government contends that it was a voluntary payment made in mistake of law which cannot be recovered back.
It is conceded that as to personal property the payment of an illegal tax is not deemed voluntary though made without protest, but it is said that as to real property, where the owner can always bring his action of ejectment, the rule is different. *608 Without stopping to inquire whether the rule generally is different, we are of the opinion that the principle applicable to cases like this is the same. Where a man is obliged to pay an illegal tax to obtain possession of his property, whether it be' personal or whether it be real, the payment is involuntary.
This case indeed seems to the court analogous in every part to the proclamation cases, De Bow, &c. (11 C. Cls. R., 672; affirmed 13 id., 562), where this question of voluntary or involuntary payment was considered. There the officers of the government had acquired possession of the claimant’s property (his cotton) lawfully. In the belief that they had a statutory right to charge him a license fee for bringing it into New Orleans they required him to pa.y one, and he paid without objection, but to obtain possession of his property. Here the officers of the government likewise had acquired possession of the claimant’s property (his house) lawfully; ■ and, in .the belief that .they had a right' to charge him the 10 per cent, interest, they required him to pay it, and he paid without objection, but to obtain possession of his property. In the words of Baron Mam tin in Steele v. Williams (20 Eng. L. & Eq. R., 319), “ to call such a payment a voluntary payment is an abuse of language.”
This case was transmitted to the court by the Secretary of the Treasury upon condition, and accompanied by a stipulation on the part of the claimant to the effect that the statute of limitations be not waived by the transmission. We proceed therefore to inquire whether the case is barred by the statute.
Three things are to be observed concerning the case: (1) The Act 7th June, 1862, under which this tax was levied, was “An act for the collection of direct taxes in insurrectionary districts within the United States.” (2) The Revised Statutes provide:
“ § 3689. There are appropriated, out of any moneys in the Treasury not otherwise appropriated, for the purposes hereinafter specified, such sums as may be necessary for the same respectively; and such appropriations shall be deemed permanent annual appropriations.

*******

“To refund to persons money collected from them without warrant of law, as in payment of dues under the direct-tax laws.”
(3 ) The exaction of 10 per cent, interest in May, 1865, on a tax imposed upon real property in Charleston was money collected “ without warrant of law.”
*609 The claim, therefore, is one for which the law provides a permanent appropriation, and concerning which the Revised Statutes in effect declare the policy of the /government to be that moneys collected by its agents under the direct-tax laws which are not really taxes, that is to say, which were “ collected without warrant of law,” shall always be refunded, and the refunding shall not be dependent upon annual appropriation acts. Thus far the policy of the government is clear, an”d the intent of Congress unquestionable.
The Joint Resolution 25th February, 1867 (14 Stat. L., 568, sec. 4), more explicitly provided:
“That the Secretary of the Treasury shall be ■ authorized -to refund to persons from whom money has been received without warrant of law, as in payment of dues under the direct-tax laws, the sums so illegally collected; such refunding to be ordered on the presentation, in each case, of satisfactory evidence of the illegal collection.”
It is not altogether clear that the application for a refund must first be made to the Secretary of the Treasury before suit can be brought; but it is clear, as was said by Mr. Justice Woods, in Mrs. Irene Taylor's Case (104 U. S. R., 216), of a section of another statute—
“ This section limits no time within which application must be made to the Treasury for the proceeds of the sale. The Secretary was not authorized to fix such a limit. Whenever the owner of the lands, or his legal representatives, should apply for the money, it was the duty of the Secretary to draw his warrant therefor, without regard to the period which had elapsed since the sale. The fact that six or any other number of years had passed did not authorize him to refuse payment. The person entitled to the money could allow it to remain in the Treasury for an indefinite period of time, without losing his right to demand and receive it. It follows that if he was not required to demand it within six years, he was not required to sue for it within that time.”
And we may add, in the language of the same learned judge:
“A construction consistent with good faith on the part of the United States should be given to these statutes. It would certainly not be fair dealing for the government to say to the owner that the surplus proceeds should be held in the Treasury for an indefinite period for his use or that of his legal representatives, and then,-upon suit brqught to recover them, to plead in bar that the demand therefor had not been made within six years.”
*610 When Congress appropriate money generally, as for the annual expenses of the government, no legislative intent can he inferred to renovate a claim or class of claims' barred by the statute of limitations. But when Congress appropriate money for the payment of a designated claim or class of claims already barred by the statute of limitations it must be inferred that the legislative intent was to give a new promise founded upon the old consideration. In such cases the statute of limitations begins to run from the enactment of the appropriation act. So when Congress give legal efficacy to a .designated claim or class of claims which were not legal rights, or which were rights without a remedy, it must be intended that the newly created claims should accrue from the passage of the enabling act or from the happening of some event prescribed therein. The cases of Hukill (16 C. Cls. R., 562) and Mrs. Taylor (14 id., 339) illustrate what is here meant. Now, in the direct-tax cases like the one at bar the claimants were without right or remedy till the joint resolution 1867 came to give them both. Manifestly, therefore,' claims which were virtually created by a joint resolution did not accrue at the previous time when the money was collected without warrant of law.
When, then, did they accure? The joint resolution named no time, but provided for the happening of an event, viz, their presentation to the Secretary of the Treasury, and upon the happening of that event each claim accrued. The joint resolution was merged in the Bevised Statutes, but it cannot be said that the statute of limitations should then begin to run, for manifestly there was no intent to change the usage or impair the rights of parties. We must therefore fall back upon the-words of the Supreme Court concerning a surplus iu the Treasury derived from tax sales and say:
“The person entitled to the money could allow it to remain, in the Treasury for an indefinite period without losing his right to demand and receive it. It follows that if he was not required to demand it within six years he was not required to. sue for it within that time.”
The judgment of the court is that the claimants recover of the defendants the sum of $40.80.