[File No. 5872.]

OSCAR BRATBERG, Respondent, v. ADVANCE-RUMELY THRESHER COMPANY, INC., a Corporation, Appellant.

(78 A.L.R. 1338, 238 N. W. 552.)

454

Opinion filed August 22, 1931.   Rehearing denied October 23, 1931.

*Lawrence, Murphy, Fuller & Powers,* for appellant.

*H. A. Mackoff,* for respondent.

458

BURKE, J. On July 16th, 1928, plaintiff entered into a written contract with the defendant for the purchase of one Rumely No. 3 Pr. Combine Harvester with standard equipment, also one 2 ft. extension, one flax sieve and one pickup attachment. The purchaser agreeing to pay the freight and charges from the factory, and upon delivery or tender thereof, settle therefor the purchase price of $1,581 as follows: $250 cash and notes at eight per cent from date, one note for $666 due September 1, 1928, and one note for $665 due September 1, 1929. All notes to be secured by first mortgage on said machinery, and also by a mortgage on one half interest in two hundred acres of wheat on the southeast $\frac{1}{4}$ of the southwest $\frac{1}{4}$ of 32 and the northeast $\frac{1}{4}$ of 31, 139, 93. The machinery was sold under the following warranty.

(2) "Said machinery (except belts, magnetos, and other accessories and parts not manufactured expressly for seller, none of which are warranted) is purchased and sold upon and subject to the following expressed warranty and agreements, and none others: When properly adjusted and competently operated according to seller's instructions on land or grain in suitable condition it will be capable of doing as good or better work than any other machine of the same kind, size and rated capacity working under like conditions on the same job.

(3) "Seller agrees to repair or replace free, F. O. B. factory, any part (except parts not warranted) which with proper use proves defec-

tive during the first three months after delivery, provided the defective part is returned to seller's branch through which it was sold, charges prepaid, within four months after delivery, and seller on inspection is satisfied it is defective. Remedy and damages for failure to repair or replace defective parts shall be limited to the cost of such part or parts, as fixed by seller's current repair price list.

(4) "Purchaser agrees to give each machine a fair trial in the manner aforesaid as soon as possible after delivery, and within five days after its first use, which, it is agreed, is a reasonable time for purchaser to inspect and test same, for latent, patent or other defects and if he shall claim it fails to fulfill said warranty he shall give seller written notice by registered letter addressed to LaPorte, Indiana, and also at seller's branch place of business through which said machine was sold, mailed within four days from the date during trial period when such defect or failure first appears, specifying the machine and in what particular it fails to fulfill the warranty, and allow a reasonable time for seller to send a competent man to examine it and put in order to comply with this contract, purchaser agreeing to render friendly assistance without compensation for labor or material furnished; or allow seller, at its option, to substitute a machine or part which when tested under like terms and conditions as to notice and otherwise shall comply, and upon failure so to do the purchaser shall immediately discontinue the use of said machine, or substituted machine, shall place the same, in as good condition as when received, at the disposal of seller at the place where he received it, free of charge, give seller immediate written notice thereof, and this sale and purchase of such defective machine or part shall be considered rescinded; seller shall return the money, notes and securities received, or proportionate part thereof, and this shall constitute the exclusive remedy of each party and a full settlement and release of all claims of every nature by one against the other pertaining to this transaction, except the obligation of purchaser to pay for all machinery not defective, and in no event shall seller be liable for any damage on account of any breach of warranty or omission by it in excess of the purchase price paid for the defective goods. Purchaser shall pay all expenses due to improper handling. . . .

(5) "Failure of purchaser to give said notice or to strictly comply with each and every covenant, promise and condition hereinbefore

specified to be performed or permitted by him as and when stated, or retention of possession or use of said machine or substitute subsequent to said times of test shall constitute an unconditional acceptance thereof and fulfillment of all warranties and obligations of seller, and no assistance rendered by seller in operating said machine or remedying any defect either before or after said trial shall waive or excuse purchaser for failure to give said notices or to comply with said covenants and conditions.

(6) "There are no terms, conditions or warranties, express, implied or statutory of quality, fitness, capacity or otherwise of the goods ordered other than or different from the printed conditional warranty aforesaid.

(7) "If this order includes more than one machine or attachment it will constitute a separate order for each machine or attachment at separate prices bearing the same ratio to the price of all as the list price of each bears to the total list price of all as shown by seller's current price list, and . . . .

(12) "Should any part, term or provision of this contract be by the courts decided to be illegal or in conflict with any law of the state where made, the validity of the remaining portions or provisions, or the right of seller to recover from purchaser the aforesaid purchase price of said goods, shall not be affected thereby. . . ."

At the time of the delivery of the machine to the plaintiff he signed a receipt stating: "It is expressly understood and agreed that the above described machinery is received by the undersigned under and pursuant to the terms and conditions of said written warranty, and not otherwise (any changes in the machinery ordered or terms of payment notwithstanding), and that said written order and warranty contains all the agreements and understandings between us on account of or pertaining to said purchase of said machinery, oral or otherwise."

M. H. Eskestrand was defendant's agent at Richardton, N. D., and the machine was purchased through him. Testifying for the defendant he said: "The machine arrived on the third of August. They had them all assembled, it appeared so and they found it was wrong and had to take the pickup off and rebore the holes for it to fit. They finally got them assembled and it took out a day and half extra. Bratberg took his machine out. I took Garrison (the defendant's expert)

out to Bratberg and left him there. When he came in he asked for the expert and I called Fargo and asked them if they could get an expert out there and they told me he was at Beach, and I called the hotel at Beach. I tried a long time to get in touch with the expert." Ques. "What was this story about your phoning to Malmo and telling him that these people were going to return their machines and wanted their money back?" Ans. "No, it might have been like Jesperson, said, they might have threatened to. I don't recall that Bratberg came into the store on October 1928, and said that he didn't want the machine, that he wanted his money back. He might have. I went to Fargo in July 1929, with Bratberg and these other gentlemen to see Mr. Malmo. I suggested that all three of them go down to Fargo, and maybe they could iron out this stuff whatever they figured they had coming and I said you better go down there, they were kicking about the machine had not been assembled right and that it should have been fixed before this time, and that they were promised before that replacement parts would come in. They insisted that I go with them. I took them in the office and I said to Mr. Malmo, here is the three fellows face to face now you can have it out. Malmo put down the repairs on a piece of paper for each one, and he said they could go out and get whatever they agreed on there, and they could have it. Hamann and Malmo had a little tilt to start with, but they got it ironed out. That was in the latter part of July 1929. Bratberg came into Richardton on the 15th of August and said he did not want the machine, and wanted his money back. He came in on the 26th day of August and I said, 'Hello Oscar, how is your combine working?' And he said, 'Just fine, you know I found where my trouble was. It was in the feeder raddle chain, it was too tight. After I started out this fall it broke every few rods, so I loosened it a little and haven't had as much trouble with my combine as I would have with my binder.' Several days afterwards, I saw Mr. Bratberg and he asked me when I wanted the combine. I told him I was agent no longer, and that was all that was said. I had a conversation with Bratberg and Jesperson in October 1928, I told them I had a letter from the Fargo office that every part that was damaged or showed flaws or whatever was broken and such stuff they would replace."

Bratberg testified: "I had 550 acres in crop in 1928, I have operated farm machinery, binders, threshing machines, tractors but had never

seen a Rumely No. 3 Combine operate before. The machine was de-. livered to me at Richardton. Mr. Garrison took them off the cars and set them up. We had to take the platform all apart and the header apart in order to drill holes to fasten the pickups on. The holes were drilled wrong. It was along about the eighth or ninth that we got them set up. We followed the instructions in the book furnished by the company, and the expert also gave advice. Mr. Garrison (the expert) was present when we started the machine, around the tenth or twelth of August. We started first to pick up some grain that we had swathed down with the header. (Grain lying in the swath.) It had been drying for four or five days and would average about twelve bushels to the acre. We started to pick up this grain and the pin on the drive sheared off when we had gone just a few rods. We had to stop to put in a new one, we only went a short distance when the same thing happened again. The pickup was too heavy for the platform and weighed it down and it was out of shape. It must weigh about 600 pounds. Going over a little rough ground where the ground would vary there was too much weight there, and it would twist the platform which would become uneven and it sagged and twisted from one side to the other. This would make quite a load on the drive and shear the pin, and the general frame of the machine would twist too. It would throw the sprockets out of line on the header part and throw the chains off, break the links, and the sprockets would get out of line. The chains would come off or break, this happened three or four times every round. We started about ten o'clock in the forenoon, we worked until noon, and after dinner until four o'clock picking up three or four acres, and going down hill it would not pick the grain up. Garrison (the expert) stayed until we took the pickup off and changed it into a straight combine. Mr. Garrison suggested that we do this. About two days after he left we started the combine, and the chains would come off the same as before and shear pins. We had to stop to make repairs three or four times every round. We operated it two or three days, and the machine kept on troubling the same as when we started in. We cut ten or twelve acres in two or three days, straight combining, working full days. I went to Mr. Eskestrand and I said, 'I am not satisfied, and I want to know what to do,' and he said, 'maybe the machine man they sent did not set it up quite right, or adjust it quite right,' and he said, 'maybe we can get

another man to adjust it.' He advised me to go home and do the best I could with the machine until he could get a man there. I did, and it worked just as it did before. We averaged about six or seven acres a day. I went back to Eskestrand and told him the machine was not working any better and the expert did not seem to show up and I wanted to return the machine. He said, 'I will call up Mr. Malmo.' I heard him call Mr. Malmo over the phone, Mr. Jesperson was present. He said to Malmo, well he said, 'Mr. Jesperson and Mr. Bratberg are in here complaining about their machines not working very good and they want to return them unless you can get men out there to fix them up.' He told us that the experts were busy and he did not know when he could get one of them but he thought it would be very soon. He again advised us to get along the best we could until the expert came. In the meantime I started out with the binder, we were making no headway with the combine so we started cutting with the binder. We went in several times after that to see Mr. Eskestrand inquiring about experts. On the sixth of September we wrote a letter to Mr. Malmo, no experts had come to that time." The letter reads as follows:

"Taylor, No. Dak. Sept. 6, 1928.

"Advance Rumely Co.
"Fargo, No. Dak.
"Dear Sirs:

"I am writing you in regard to my combine, which has not worked satisfactory from the time I got it. I have nothing but trouble and breakdowns all the while. It was not set up right in the first place, as the man that come here to set it up didn't know his stuff; so I have taken a big loss on my crop.

"I had to cut over half of my crop with the Binder and also had to hire some cut with a combine, so if you had sent a man that knew his business or sent another man when we called for one it probably would have been different.

"I also lost my threshing run on account of monkeying along such a long time not getting my harvesting done, which meant $1,000 or more loss to me, so what are you going to do about it.

"I remain yours truly,<br>"Oscar Bratberg."

The following letter is the answer to Mr. Bratberg's letter.

Sept. 11, 1928.

"Re: Order 61641-Oscar Bratberg.

"Mr. Oscar Bratberg,

"Taylor, N. D.

Dear Sir:

"We have your letter of the 6th advising us that the combine has not worked satisfactorily and that you have had a number of breakdowns, and you ask what we are going to do about it.

"I imagine the simplest way of setting forth our position on the matter, is to refer you to your copy of the purchase contract that you signed for this combine. That purchase contract sets forth clearly just what is required of you if the machine does not fulfill its warranty, and what is required of us in return.

"We have never had any notice from you within the period covered by the order form, to the effect that the machine was not fulfilling its warranty, and can only conclude therefore that it has done so. You may have had some minor difficulties, that we do not question as we are not in position to argue it with you, but in any event you evidently did not have difficulties to the point of not continuing operation of the machine.

"We are not responsible for such delays or damages as you set forth, and naturally must stand on our purchase contract with you, just as you would do if the positions were reversed. Your September 1st note of $666.00 is part due, with interest from July 13, 1928, and we must insist that you kindly remit for this note in full at once in the amount of $675.00.

"Your very truly,

"Advance Rumely Thresher Co., Inc.

"G. M. Malmo, Branch Manager."

"I hired Frank Madison to come with his combine. About two or three days after we had received the letter from Mr. Malmo, Mr. Peterson came out, he put on a new raddle chain or fixed up the old one and

he worked a day, or a day and a half fixing up the machine; he said it was all right. It worked a little better for about a day or two when we ground off the sprocket of the header part. I went back to Richardton and saw Mr. Eskestrand again. Mr. Peterson was there again on the 21st and it broke while he was operating it. He told me to go to Jesperson and get a sprocket off of his machine and put on that, and I did. He put on the sprocket and started it up. It worked pretty well. The next morning we went about a mile and there goes the old fender chain through the cylinder, it broke and went through again. I went and saw Mr. Eskestrand again, that was the 28th or 29th of September 1928. I told him I was broke down again worse than before, and I wanted nothing more to do with the machine and wanted my money back, I would return the machine. I offered to bring the machine into town. He still contended it was a good machine. I did not use it any more that fall. I told Eskestrand it was there any time he wanted it, and I got Mr. Madison with his combine to finish cutting the wheat. Altogether in 1928, we cut about 125 to 150 acres of grain with the combine and had 550 acres altogether. Mr. Church came there, and said, first money was due and I better pay it. I said, I did not feel like paying until I was sure they would do something. I offered to return the machine but he did not want it. The company did come and take parts off of the machine. I did not pay Church the first note and he started a foreclosure of the mortgage on the crop, and I paid it to the sheriff. Later I had a talk with Mr. Eskestrand and he told me, later in the fall that they were going to rebuild the machines and put them in good running order before the next season. We sent Walter Hamann down to Fargo to see Mr. Malmo. I said to Mr. Church at the time I paid the sheriff, they got the mortgage and rather than have my crop tied up I would pay up and deal with the company later. Sometime later we received a letter from the company (plaintiff's exhibit 11) dated June 29, 1929, and reads as follows:

" 'Dear Sir:

" 'We have shipped to you by Freight Prepaid new parts for your combine, as per attached railway Bill of Lading. Please take delivery of these parts and hold them until our service man gets to you.

" 'In the course of the next thirty days one of our service men will be there for the purpose of installing these parts on your combine

" 'Yours very truly,

" 'Advance Rumely Thresher Company, Inc.

" 'J. J. McCutcheon, Assistant Branch Manager.'

"The latter part of July 1929, the expert, Mr. Peterson, installed the different parts and on the 28th or 29th Jesperson, Hamann, Eskestrand and myself went to Fargo, and talked to Malmo. When he got through with Jesperson he turned to me and said, 'what is your story,' and I said, 'very much like Jesperson's,' Jesperson said, the parts put on his machine did not seem to help any. Malmo said, 'it really did not take much to overcome the difficulty.' Jesperson said, he did not see how those parts would help any that he had not tried it, but if it keeps on working like it did last year I will return it. He asked me, if I had started it up and I said no, because, there were some parts missing yet from the year before. They had taken them off. Some parts were taken off and I hadn't received them yet. I tried to get them while we were in Fargo, but they were not on hand. I got one little part for the shute, and Malmo gave me an order to get these parts from the repair room. I started up the machine about the 10th or 11th of August in wheat that would average about 11 to 12 bushel. The machine cut good for a few days and then it came back to the same trouble I had a year before, chains broke and came off and the machine sagged and twisted. I worked with it better than a week, averaged about ten to twelve acres a day, when I got into flax I tried to cut flax it would not cut it, or separate it and I figured if it would not cut flax it was no good to me. I went to Mr. Eskestrand and told him I was going to return the machine and he said he did not want it. It was a day or two after I offered to bring it in to Richardton and put it right there by his place where I received it. He said he didn't want a thing to do with it. I then told him it would be on my dad's place. I cut the flax then with a header part of it and then Mr. Madison came and cut some of it with his combine. The machine is still there with the attachments. I am willing to return it to the company and can do so."

Mr. Bratberg was recalled for further cross-examination. Ques.

"And the next thing that happened after you shook hands with Mr. Malmo and took your parts and Malmo said good by to you was this letter of September 4th, 1929 in which you said here is your machine, I want my money back, that is all the communication you had with the company aside from your talk with Eskestrand?" Ans. "Yes."

Plaintiff's exhibit 9 reads as follows:

"Richardton, N. Dak., April 8, 1929.

"Advance Rumely Thresher Co., Inc.,

"Gentlemen:

"We the undersigned having 'bought No. 3 Prairie type combines with pickup attachments, from your local dealer Martin Eskestrand, in the summer of 1928, feel that these combines did not give as good service as we expected and were told. We are making the following complaints and wish you would try to remedy these weaknesses of your combines and pickups.

"The feeder chain, raddle chain, return elevator and elevator chains, chain driving sickle, canvas and reels and also chain driving pickup are too weak and wish you would put in heavier chains with sprockets to fit.

"The wooden boxings on header spout always burn out and should have either roller or babbit bearings.

"The header spout should be built more solid and should not be sticking so far in the feeder house. The header spout either should not be sticking so far in the feeder house or the feeder should be built bigger. By building the header spout more solid it would not be so apt to tear the main canvas.

"The platform should be braced off better as it twists and sags thus throwing the drive chain off line, that drives the canvas reels, and sickle. It also tears the canvas by doing this.

"The pickup should have spring teeth and should have a stronger platform to be fastened onto, or a special platform which we think we should have as we bought these pickups with the understanding that they would work with this platform. It is impossible to use the pickup with the ordinary platform.

"The lever to raise and lower platform is too weak and we should have a stronger lever or the same attachment as on the No. 2 combine.

"It is almost impossible to use these combines without having these parts replaced.

"Hans Jesperson       V. M. Zimmerman
"Oscar Bratberg       Water Hamann."

The plaintiff's testimony is corroborated in part by Mr. Knuteson, Mr. Jesperson and Mr. Hamann, and is disputed in part by Mr. Malmo and Mr. Eskestrand.

On October 1, 1929, the plaintiff brought this action to recover of the defendant the purchase price paid for the machine, claiming that there was an implied warranty that the machine was reasonably fit for the purpose for which it was purchased; that after inspecting and testing of said machine it did not prove to be reasonably fit for the purpose for which it was purchased, and that within a reasonable time after delivery, inspection and testing the contract was rescinded by giving notice to the defendant and its agent within a reasonable time and that he offered to return the said combine and attachment to the defendant and placed the same at the disposal of the defendant.

The defendant answered setting up its contract of guaranty and alleged that the combine and attachments were received and delivered under the terms and conditions of the original contract and order, that said machinery was accepted by the plaintiff after full and complete trial and examination of said machinery strictly in accordance with the terms in said order. The sale thereby became an absolute sale, and the warranty therein contained became and was, and is, fully satisfied and discharged; that said plaintiff has used said machinery for a period exceeding ten days after the date of delivery and that said machinery was reasonably fit for the purpose for which it was purchased; said defendant relies solely upon the written contract of guaranty, and alleges that the plaintiff has not complied therewith.

Defendant further alleges that chapter 238, Laws of 1919, relied upon by plaintiff is unconstitutional, that it deprives the defendant of valuable property rights, the freedom of contract, attempts to impair the right of the defendant to freely contract with its customers, and is in violation of the constitution of the state of North Dakota, and in violation of the Constitution of the United States.

The case was tried to a jury and a verdict was returned for the plaintiff.

Service of notice of entry of judgment was admitted by defendant's attorneys on the 14th of December 1929, and on the 12th day of June, 1930, the sheriff of Stark county served upon plaintiff's attorney a motion for a judgment notwithstanding the verdict, or in the alternative for a new trial, based upon a statement of the case to be thereafter settled, allowed and certified by the court and upon all the pleadings, files, records and orders of the court. Attached to this motion is a notice that the defendant intends to move for judgment notwithstanding the verdict, or in the alternative for a new trial. The motion to be submitted to the court on the 12th day of June at the court house in the chambers of the court at Dickinson, Stark county, North Dakota, or at such time as the hearing may be extended and continued by the court. After the service of this notice upon plaintiff's attorney, he made and filed a special appearance objecting to the jurisdiction of the court to hear and determine the said motion, for reason, that the same had not been served within six months from the time of the service of notice of entry of judgment upon the defendant.

Plaintiff's objection is supported by the affidavit of H. A. Mackoff to the effect that the notice was served upon him about 11 o'clock A. M. June 12, 1930, that the court was not in session at the court house or at chambers of the court at Dickinson, in Stark county, and that said motion was not brought on for hearing at said time and place by the defendant, or by any other person, and that no proceedings at all were had, and that affiant did not have an opportunity to present a special appearance and objection to the motion at said time and place. This notice of motion to be made on the 12th day of June, 1930, does not state any hour upon which the motion will be heard, and there is in the record an ex parte order signed by the Judge dated June 10, 1930, fixing the time for hearing of said motion on August 12, 1930. There is a notice which was served August 18, 1930, on plaintiff's attorney that the motion would be brought on for hearing on the 27th of August at 10 o'clock. On the fifth day of September, 1930, the trial judge signed an order denying the motion of the defendant for judgment notwithstanding the verdict, or in the alternative for a new trial, stating, "the motion of the defendant in the above entitled action for a judgment

notwithstanding the verdict, or in the alternative for a new trial having been noticed for hearing before the court on the 12th day of June, 1930, at Dickinson, N. Dak., and thereafter the plaintiff having filed his special appearance and objection to the jurisdiction of the court to hear the said motion, and thereafter the defendant having served an additional notice of the hearing of said motion at chambers at Hettinger, N. Dak. on the 27th day of August, 1930, and this court on the said 27th day of August, 1930, having considered the motion of the defendant for judgment notwithstanding the verdict or in the alternative for a new trial and the special appearance and objection of the plaintiff, and the court having considered the same and all of the files, pleadings, and records, and statement of the case. . . .

It is hereby ordered, that the motion of the defendant is hereby in all things denied upon the merits." Thereafter and on the 12th of September, 1930, the defendant appealed from the order.

It is the contention of the respondent that the court lost jurisdiction, for the reason, that the motion was not served in time, and that it was not waived by a general appearance.

Section 7664, Comp. Laws 1913, provides that an "Application for a new trial based upon a statement of case or affidavits, or both, except applications upon the ground of newly discovered evidence, must be heard within sixty days after the rendition of a verdict or notice of the decision of the court to be reviewed, or such further time as a court shall allow."

Section 7666, Comp. Laws 1913, provides that, "The court or judge may, upon good cause shown, in furtherance of justice, extend the time . . . ."

The notice of entry of judgment was given on the 14th of December, 1929. Nothing further was done in the matter until the 12th day of June, 1930, when the appellant served notice of his motion for judgment notwithstanding the verdict or for a new trial. This notice was served upon the same day that the hearing was to be had, viz., the 12th day of June, 1930, no hour is stated in the notice for the hearing of the motion, and it appears from the affidavit of the attorney for respondent, filed with his special appearance that there was no judge in Dickinson on that day and no opportunity for the hearing of any case. Two days

before the date set for hearing the judge issued an ex parte order extending the time for hearing to the 12th of August.

Section 7664, supra, provides that, "All applications for a new trial, made upon the minutes of a court, must be heard upon eight days' notice, within sixty days after the return of a verdict or decision of the court." An application for a new trial based upon the statement of a case must be heard within sixty days from the rendition of the verdict or notice of a decision. No time for service of notice is specified but when the motion is based on a statement of the case, notice is, of course, required and since no time is specified it is governed by § 7955, Comp. Laws 1913, which provides that, "Notice of motion or other proceeding before a court or judge, when personally served, shall be given at least eight days before the time appointed therefor." The service of the notice of motion having been made on the same day that the hearing was noticed for, was a mere nullity and was not waived by a general appearance. There was no legal service of the motion until August 18, 1930, more than two months after the expiration of the six month period, and it is well settled in this state that the notice must be served and the date of hearing on the motion fixed within the time that an appeal may be taken from a judgment, which time is six months from the date of the service of notice of entry of judgment. Coughlin v. Ætna L. Ins. Co. 49 N. D. 948, 194 N. W. 661; Grove v. Morris, 31 N. D. 8, 151 N. W. 779; Higgins v. Rued, 30 N. D. 551, 153 N. W. 389; Garbush v. Firey, 33 N. D. 154, 156 N. W. 537; Skaar v. Eppeland, 35 N. D. 116, 159 N. W. 707; Gohl v. Bechtold, 37 N. D. 141, 163 N. W. 725; Bovey-Shute Lumber Co. v. Donahue, 43 N. D. 247, 175 N. W. 205.

It follows, that the appeal from the order denying appellant's motion for judgment notwithstanding the verdict, or for a new trial, must be dismissed. Appellant, however, appealed from the judgment in time, specifying the same errors as those specified in the motion for a new trial and including an assignment of error in overruling a motion for a directed verdict made at the close of the case, so that every question raised on the motion for a new trial is before the court on the appeal from the judgment. "A motion for a directed verdict challenges the sufficiency of the evidence and raises question of law, reviewable on appeal from judgment." Rokusek v. National Union F. Ins. Co. 50

N. D. 123, 195 N. W. 300; McLeod v. Simon, 51 N. D. 533, 200 N. W. 790.

The first contention is, that the action is in equity to rescind a contract. There is no merit in this contention. It is an action to recover the purchase price of machinery which is claimed by the plaintiff to be unfit for the purpose for which it was purchased, the purchaser claiming that the contract was duly rescinded.

Second, the appellant contends that chapter 238 of the Laws of 1919, which provides that, "Any . . . person . . . purchasing any gas or oil burning tractor, gas or a steam engine, harvesting or threshing machinery for their own use shall have a reasonable time after delivery for the inspection and testing of the same, and if it does not prove to be reasonably fit for the purpose for which it was purchased the purchaser may rescind the sale by giving notice within a reasonable time after delivery to the parties from whom any such machinery was purchased, or the agent who negotiated the sale or made delivery of such personal property or his successor, and placing same at the disposal of the seller, is unconstitutional." It is appellant's contention that this law is in conflict with the 14th Amendment to the Constitution of the United States, and § 13 of the constitution of North Dakota.

There is nothing in the 14th Amendment or in said section 13, which affects in any way the right of a state to make reasonable classifications. The 14th Amendment does not prohibit reasonable classsifications of persons and things for the purpose of legislation, but such classification is distinctly contemplated by the amendment. The state may classify persons and objects for the purpose of legislation if the classification is based on proper and justifiable distinction considering the purpose of the law. "From the earliest days, classification has been made by legislatures whereby some people have rights or suffer burdens which others do not. It has been said that it is the essence of a classification that on one classs are cast duties and burdens different from those resting on the general public and that the very idea of classification is that of inequality. The mere fact that legislation is based on a classification and is made to apply to certain classifications and not to others does not affect its validity if it be so made that all persons subject to its terms are treated alike under like circumstances and condition." 6 R. C. L. 373, § 369.

In the instant case the law applies equally to all persons within the classification. It affects every seller of any gas or oil burning tractor, gas or steam engine, harvesting or threshing machinery in the same way. On the other hand, every person who purchases any of said machinery has the same privileges as every other purchaser of such machinery. There is no discrimination made between sellers. They all have the same burden if it is a burden and there is no discrimination between purchasers. Therefore, it is a reasonable classification, and there was no error overruling the appellant's objections, or in refusing to give his instructions requested to be given to the jury on that subject.

Section 2 of the act reads as follows: "Any provision in any written order or contract of sale, or other contract which is contrary to any of the provisions of this act is hereby declared to be against public policy and void." It is the contention of appellant that both sections of the law interfere with the freedom of contract and is a violation of the 14th Amendment of the Constitution of the United States and § 13 of the Constitution of the State of North Dakota, relying on Allgeyer v. Louisiana, 165 U. S. 583, 589–592, 41 L. ed. 832, 835–837, 17 S. Ct. 427; Adair v. United States, 208 U. S. 161, 172–174, 52 L. ed. 436, 441, 442, 28 S. Ct. 277, 13 Ann. Cas. 764; Coppage v. Kansas, 236 U. S. 1, 9, 17, 59 L. ed. 441, 447, L.R.A.1915C, 960, 35 S. Ct. 240; Adkins v. Children's Hospital, 261 U. S. 525, 545–553, 67 L. ed. 785, 791, 795, 24 A.L.R. 1238, 43 S. Ct. 394.

If the legislature had authority to enact a law providing that: "Any purchaser of any gas or oil burning tractor, gas or steam engine, harvesting or threshing machine for their own use shall have a reasonable time after delivery for the inspection and testing of the same, and if it does not prove to be reasonably fit for the purpose for which it was purchased the purchaser may rescind the sale by giving notice within reasonable time," it follows as a matter of course, that it would have authority to provide that any written order of contract of sale, or other contract which is contrary thereto shall be void. The statutory provisions relating to a reasonable time for inspection and testing, and to a reasonable time for returning the machinery in case it is not reasonably fit for the purpose for which it was purchased if legal, becomes a part of every contract of sale of any such machinery, and if

the first section of chapter 238 is legal section 2 is also legal. Section 2, however, does emphasize the necessity of such legislation as a police regulation and declares all orders and contracts contrary to any provisions of the act void as against public policy.

It is well settled that a state may pass laws and police regulations for the prevention of fraud, regulating weights, measures, packages, inspection laws, substitutes, imitations, adulterations, forms of business liable to abuse, etc., but the loss occasioned by fraud which may be sustained in such business is merely nothing when compared to the loss which may be sustained by fraud and deceit in the purchase of farm machinery, in a great agricultural state like North Dakota. Even the "blue sky" laws regulating the sale of stocks is not so affected with a public interest as the sale of farm machinery in an agricultural country, and the state legislature has a wide latitude in the enactment of police regulations affecting a public interest.

In the case of Powell v. Pennsylvania, 127 U. S. 678, 32 L. ed. 253, 8 S. Ct. 992, 1257, the court had under consideration a law enacted in the state of Pennsylvania prohibiting the sale of oleomargarine, a commodity intended as a substitute for butter. At the trial in the Pennsylvania court, the defendant offered to prove that it was made from pure animal fat, was clean and wholesome, containing the same elements as dairy butter, the only difference between them being that the manufactured article contained a smaller proportion of the fatty substance known as butterine; and that this was increased by the introduction of milk and cream; so that the article contained all of the elements of butter produced from pure unadulterated milk or cream, except that the percentage of butterine was slightly smaller.

On appeal to the Supreme Court of the United States, Powell v. Pennsylvania, supra, the court said: "It is scarcely necessary to say that if this statute is a legitimate exercise of the police power of the State for the protection of the health of the people, and for the prevention of fraud, it is not inconsistent with that Amendment; for it is the settled doctrine of this court that, as government is organized for the purpose, among others, of preserving the public health and public morals, it cannot divest itself of the power to provide for those objects; and that the Fourteenth Amendment was not designed to interfere with exercise of that power by the States. Mugler v. Kansas, 123 U.

S. 663, 31 L. ed. 211, 8 S. Ct. 273; Butchers' Union S. H. & L. S. L. Co. v. Crescent City L. S. L. & S. H. Co. 111 U. S. 746–751, 28 L. ed. 585–587, 4 S. Ct. 652; Barbier v. Connolly, 113 U. S. 27, 28 L. ed. 923, 5 S. Ct. 357; Yick Wo v. Hopkins, 118 U. S. 356, 30 L. ed. 220, 6 S. Ct. 1064. 'Every possible presumption,' Chief Justice Waite said, speaking for the court in Sinking Fund Cases, 99 U. S. 700–718, 25 L. ed. 496, 501, 'is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule.' "

The question was before the court again in the case of Schollenberger v. Pennsylvania, 171 U. S. 1, 43 L. ed. 49, 18 S. Ct. 757, and the court adhered to its former decision, but held, that when olcamargarine was an article of interstate commerce it could be sold in the original package in Pennsylvania. The legislature is vested with wide discretion in the enactment of necessary legislation in the interest of the general welfare of the people.

In the case of People ex rel. Durham Realty Corp. v. LaFetra, 230 N. Y. 429, 16 A.L.R. 152, 130 N. E. 601, an act forbidding a landlord to take more than a reasonable rent for use of his property in case of a housing shortage and forbidding the eviction of a tenant willing to pay a reasonable rent at the expiration of his term was held by the Supreme Court of the State of New York to be constitutional, as not interfering with the right of contract. The court said: "The proposition is equally fundamental that the state may establish regulations reasonably necessary to secure the general welfare of the community by the exercise of its police power, although the rights of private property are thereby curtailed and freedom of contract is abridged. Chicago, B. & Q. R. Co. v. Illinois, 200 U. S. 561, 50 L. ed. 596, 26 S. Ct. 341, 4 Ann. Cas. 1175; Rast v. Van Deman & L. Co. 240 U. S. 342, 60 L. ed. 679, L.R.A.1917A, 421, 36 S. Ct. 370, Ann. Cas. 1917B, 455; American Coal Min. Co. v. Special Coal & Food Commission (D. C.) 268 Fed. 563." Continuing the court said: "The legislative or police power is a dynamic agency, vague and undefined in its scope, which takes private property or limits its use when public needs require, uncontrolled by the constitutional requirement of due

process. Either the rights of property and contract must, when necessary, yield to the public convenience, advantage and welfare, or it must be found that the state has surrendered one ·of the attributes of sovereignty for which governments are founded, and made itself powerless to secure to its citizens the blessings of freedom and to promote the general welfare." On appeal to the Supreme Court of the United States the writ of error was dismissed October 10th, 1921, 257 U. S. 665, 66 L. ed. 424, 42 S. Ct. 47. The District of Columbia passed a similar law which was considered by the Supreme Court in the case of Block v. Hirsh, 256 U. S. 135, 65 L. ed. 865, 16 A.L.R. 165, 41 S. Ct. 458. In this case the court held that the law was not a violation of the 5th Amendment to the Constitution which Amendment affects the power of the Congress of the United States. The court said: "The general proposition to be maintained is that circumstances have clothed the letting of buildings in the District of Columbia with a public interest so great as to justify regulation by law. Plainly, circumstances may so change in time or so differ in space as to clothe with such an interest what at other times or in other places would be a matter of purely private concern. It is enough to refer to the decisions. . . . They sufficiently illustrate what hardly would be denied. They illustrate also that the use by the public generally of each specific thing affected cannot be made the test of public interest, and that the public interest may extend to the use of land. They dispel the notion that what in its immediate aspect may be only a private transaction may not be raised by its class or character to a public affair. See also Noble State Bank v. Haskell, 219 U. S. 104, 55 L. ed. 112, 32 L.R.A.(N.S.) 1062, 31 S. Ct. 186, Ann. Cas. 1912A, 487."

In the case of Strickley v. Highland Boy Gold Min. Co. 200 U. S. 527, 50 L. ed. 581, 26 S. Ct. 301, 4 Ann. Cas. 1174, the court said: "The plaintiffs in error set up in their answer to condemnation proceedings that the right of way demanded is solely for private use, and that the taking of their land for that purpose is contrary to the 14th Amendment to the Constitution of the United States. The mining company on the other hand relies on the statutes of Utah, which provide that 'the right of eminent domain may be exercised in behalf of the following uses: Roads, railroads, tramways, tunnels, ditches, flumes, pipes and dumping places to facilitate the milling, smelting or other

reduction of ores, or the working of mines.' . . . The single question, then, is the constitutionality of the Utah statute, and the particular facts of the case are material only as showing the length to which the statute is held to go. . . . The question thus narrowed is pretty nearly answered by the recent decision in Clark v. Nash, 198 U. S. 361, 49 L. ed. 1085, 25 S. Ct. 676, 4 Ann. Cas. 1171. That case established the constitutionality of the Utah statute, so far as it permitted the condemnation of land for the irrigation of other land belonging to a private person, in pursuance of the declared policy of the State. In discussing what constitutes a public use it recognizes the inadequacy of use by the general public as a universal test." These last two cases involve the right of eminent domain, which is not involved in the instant case, but they show how far legislatures may go when necessary in the enactment of police regulations and yet be sustained by the highest court in the land.

In the case of McLean v. Arkansas, 211 U. S. 539, 53 L. ed. 315, 29 S. Ct. 206, the court said: "Liberty of contract which is protected against hostile state legislation is not universal, but is subject to legislative restrictions in the exercise of the police power of the state. The legislature of a state is primarily the judge of the necessity of exercising the police power and courts will only interfere in case the act exceeds legislative authority; the fact that the court doubts its wisdom or propriety affords no ground for declaring a state law unconstitutional or invalid. Laws tending to prevent fraud and to require honest weights and measures in the transaction of business have frequently been sustained in the courts, although in compelling certain modes of dealing they interfere with the freedom of contract."

In Schmidinger v. Chicago, 226 U. S. 578, 57 L. ed. 364, 33 S. Ct. 182, Ann. Cas. 1914B, 284, a law prescribing standard sizes of loaves of bread and prohibiting the sale of other sizes was sustained. The court said: "There is no absolute liberty of contract, and limitations thereon by police regulations of the state are frequently necessary in the interest of public welfare and do not violate the freedom of contract guaranteed by the 14th Amendment. The ordinance of Chicago of 1908, enacted under legislative authority, fixing standard sizes of bread loaves and prohibiting the sale of other sizes, is not unconstitutional as depriving those dealing therein of their property without due

process of law or as denying them equal protection of the law or as interfering with the liberty of contract." Affirming Chicago v. Schmidinger, 245 Ill. 317, 92 N. E. 244, and quoting from Gundling v. Chicago, 177 U. S. 183, 44 L. ed. 725, 20 S. Ct. 633, as follows: "Regulations respecting the pursuit of a lawful trade or business are a very frequent occurrence in the various cities of the country, and what such regulations shall be and to what particular trade, business or occupation they shall apply, are questions for the State to determine, and their determination comes within the proper exercise of the police power by the State, and unless the regulations are so utterly unreasonable and extravagant in their nature and purpose that the property and personal rights of the citizen are unnecessarily, and in a manner wholly arbitrary, interfered with or destroyed without due process of law, they do not extend beyond the power of the State to pass, and they form no subject for Federal interference."

In the case of Purity Extract & Tonic Co. v. Lynch, 226 U. S. 192, 57 L. ed. 184, 33 S. Ct. 44, the court said: "The state court following its decision in Fuller v. Jackson, 97 Miss. 237, 30 L.R.A.(N.S.) 1078, 52 So. 873, said: Poinsetta may or may not be an intoxicant, but it is a malt liquor, and as such is prohibited from being sold in this state. The prohibition law cannot be made effective unless it excludes all subterfuges." On appeal to the United States Supreme Court, 226 U. S. 192, 57 L. ed. 184, 33 S. Ct. 44, the court held, that the decision of the Mississippi court was binding on the United States Supreme Court. "The case was tried on an agreed statement of facts; that Poinsetta was composed of pure distilled water to the extent of 90.45 per cent., the remaining 9.55 per cent being solids derived from cereals, which are in an unfermented state and are wholesome and nutritious;' that 'it contains 5.73 per cent of malt and is sold as a beverage;' that it does not contain either alcohol or saccharine matter; that it is not intoxicating; that it 'cannot be employed as a subterfuge for the sale of beer because it is bottled in a distinctive way and the name blown in the bottle.'" The court said: "It is also well established that, when a state exerting its recognized authority undertakes to suppress what it is free to regard as a public evil, it may adopt such measures having reasonable relation to that end as it may deem necessary in order to make its action effective. It does not follow

that because a transaction separately considered is innocuous it may not be included in a prohibition the scope of which is regarded as essential in the legislative judgment to accomplish a purpose within the admitted power of the Government. Booth v. Illinois, 184 U. S. 425, 46 L. ed. 623, 22 S. Ct. 425; Otis v. Parker, 187 U. S. 606, 47 L. ed. 323, 23 S. Ct. 168; Ah Sin v. Wittman, 198 U. S. 500, 49 L. ed. 1142, 25 S. Ct. 756; New York ex rel. Silz v. Hesterberg, 211 U. S. 31, 53 L. ed. 75, 29 S. Ct. 10; Murphy v. California, 225 U. S. 623, 56 L. ed. 1229, 41 L.R.A.(N.S.) 153, 32 S. Ct. 697."

In Booth v. Illinois, 184 U. S. 425, 46 L. ed. 623, 22 S. Ct. 425, supra, the court said: "It must be assumed that, the legislature was of the opinion that an effectual mode to suppress gambling grain contracts was to declare illegal all options to sell or buy at a future time, and the court could not say that the means employed were not appropriate to the end which it was competent for the state to accomplish."

In Armour & Co. v. North Dakota, 240 U. S. 510, 60 L. ed. 771, 36 S. Ct. 440, Ann. Cas. 1916D, 548, a North Dakota statute requiring lard when not sold in bulk to be put up in pails or other containers holding a specified number of pounds net weight or even multiples thereof and labeled as specified, was upheld as not unconstitutional as denying equal protection of the law or as depriving the seller of their property without due process of law. In the case of State v. Armour & Co. 27 N. D. 177, L.R.A.1916E, 386, 145 N. W. 1033, Ann. Cas. 1916B, 1149, this court held, that under the police power the state can interfere with private rights when necessary to protect the public from fraud or opportunity for fraud.

In the case of Cofman v. Ousterhous, 40 N. D. 390, 18 A.L.R. 219, 168 N. W. 826, this court said: "The police power of the state is not limited to regulations necessary for the preservation of good order, or the public health or safety. The prevention of fraud and deceit, cheating and imposition and unfair competition, are equally within its province."

We have not overlooked the case of Jay Burns Baking Co. v. Bryan, 264 U. S. 504, 68 L. ed. 813, 32 A.L.R. 661, 44 S. Ct. 412, wherein the court held: "A statute requiring bread in quantities of twenty-five loaves to maintain a specified weight twenty-four hours after baking, with a limit of variation so narrow that it can be maintained only by

wrapping the bread, or by other artificial means, is unreasonable and void." Since the weight required could only be maintained by artificial means it was held to be unreasonable, and the reasonableness of a police regulation is always involved.

In the case of Weaver v. Palmer Bros. Co. 270 U. S. 402, 70 L. ed. 654, 46 S. Ct. 320, a law prohibiting the use of shoddy in the manufacture of comfortables for beds was not sustained as necessary to prevent deception since purchaser may be protected by the requirements of designation of material entering into their manufacture. The court points out specifically that the public might be protected against fraud or deception by requirements of designation of materials. If the law instead of prohibiting the sale had only required "shoddy" to be sold as "shoddy" it would have been sustained.

The case of Chas. Wolff Packing Co. v. Court of Industrial Relations, 262 U. S. 522, 67 L. ed. 1103, 27 A.L.R. 1280, 43 S. Ct. 630, is not in point. In that case the law took from the parties the right of contract and placed it in a court making the parties subject thereto.

In the case of Chicago, B. & Q. R. Co. v. McGuire, 219 U. S. 549, 55 L. ed. 328, 31 S. Ct. 259, the court had under consideration a statute from Iowa providing: "Every corporation operating a railway shall be liable for all damages sustained by any person, including the employees of such corporation, in consequence of the neglect of an agent, or by any mismanagement of the engineers or other employees thereof, and in consequence of the wilful wrongs, whether of commission or omission of such agent, engineers, or other employees; when such wrongs are in any manner connected with the use and operation of any railway on or about which they shall be employed and no contract which restricts such liability shall be legal or binding." To this law there was an amendment in 1898, "nor shall any contract of insurance relief, benefit or indemnity in case of injury or death, entered into prior to the injury, between the person so injured and such corporation or any other person or association acting for such corporation, nor shall the acceptance of any such relief, insurance benefit or indemnity by the person injured, . . . constitute any bar or defense brought under the provisions of this section." It was claimed that the statute was repugnant to the 14th Amendment of the Constitution of the United States as an unwarranted interference with

liberty to make contracts, and second, as a denial of the equal protec-
tion of the laws. The Iowa court held, that the law was constitutional.
McGuire v. Chicago, B. & Q. R. Co. 131 Iowa, 340, 33 L.R.A.(N.S.)
706, 108 N. W. 902 and id. 138 Iowa, 664, 116 N. W. 801. On ap-
peal 219 U. S. 549, 55 L. ed. 328, 31 S. Ct. 259, Judge Hughes (now
Chief Justice) said: "The first ground of attack is that the statute
violates the 14th Amendment by reason of the restraint it lays on liberty
of contract. This section of the Code of Iowa (§ 2071) as originally
enacted, imposed liability upon railroad corporations for injuries to
employees, although caused by the negligence or mismanagement of
fellow-servants. And it was held by this court that it was clearly
within the competency of the legislature to prescribe this measure of
responsibility. Minneapolis & St. L. R. Co. v. Herrick, 127 U. S.
210, 32 L. ed. 109, 8 S. Ct. 1176; Missouri P. R. Co. v. Mackey, 127
U. S. 205, 32 L. ed. 107, 8 S. Ct. 1161. The statute in its original
form also provided that 'no contract which restricts such liabilities shall
be legal or binding.' . . . But it was recognized in the cases cited,
as in many others, that freedom of contract is a qualified and not an
absolute right. There is no absolute freedom to do as one wills or to
contract as one chooses. The guaranty of liberty does not withdraw
from the legislative supervision that wide department of activity
which consists of making contracts, or deny to government the power
to provide restricted safeguards. Liberty implies the absence of arbi-
trary restraint, not immunity from reasonable regulations and pro-
hibitions imposed in the interest of the community. Crowley v.
Christensen, 137 U. S. 89, 34 L. ed. 620, 11 S. Ct. 13; Jacobson v.
Massachusetts, 197 U. S. 11, 49 L. ed. 643, 25 S. Ct. 358, 3 Ann. Cas.
765. 'It is within the undoubted power of government to restrain some
individuals from all contracts as well as all individuals from some
contracts. . . . And, indeed, may restrain all engaged in any
employment from any contract in the court of that employment which
is against public policy. The possession of this power by government
in no manner conflicts with the proposition that, generally speaking,
every citizen has a right freely to contract for the price of his labor,
services, or property.' Frisbie v. United States, 157 U. S. 165, 166,
39 L. ed. 658, 659, 15 S. Ct. 586. . . . The principle was thus

stated in McLean v. Arkansas, 211 U. S. 547, 548, 53 L. ed. 319, 320, 29 S. Ct. 206: 'The legislature, being familiar with local conditions, is primarily the judge of the necessity of such enactments. The mere fact that a court may differ with the legislature in its views of public policy, or that judges may hold views inconsistent with the propriety of the legislation in question, affords no ground for judicial interference, unless the act in question is unmistakably and palpably in excess of legislative power. If there existed a condition of affairs concerning which the legislature of the state, exercising its conceded rights to enact laws for the protection of the health, safety or welfare of the people, might pass the law, it must be sustained; if such action was arbitrary interference with the right to contract or carry on business, and having no just relation to the protection of the public within the scope of the legislative power the act must fail. . . . But the fact that both parties are of full age and competent to contract does not necessarily deprive the state of the power to interfere, where the parties do not stand upon an equality.' "

In the case of Erie R. Co. v. Williams, 233 U. S. 685, 58 L. ed. 1155, 51 L.R.A.(N.S.) 1097, 34 S. Ct. 761, the court had under consideration a law of the state of New York requiring "Every manufacturing, mining, quarrying, mercantile, railroad, street railway, canal, steamboat, telegraph and telephone company, every express company, every corporation engaged in harvesting and storing ice, and every water company, not municipal, and every person, firm or corporation engaged in or upon any public work for the state or for any municipal corporation thereof, either as a contractor or a subcontractor therewith, shall pay to each employee engaged in his, their or its business the wages earned by such employee in cash. No such company, person, firm or corporation shall hereafter pay such employees in script, commonly known as store money-orders." The court said: "While it is a fundamental principle that personal liberty includes the power to make contracts, the liberty of making contracts is subject to conditions in the interest of the public welfare. Each act of the legislature has the presumption that it has been enacted in the public interest and the burden is on him who attacks it. The burden of the party attacking a police regulation as unconstitutional under the due process clause is not sustained by the mere principle of liberty of contract; it can

only be sustained by showing that the statute conflicts with some constitutional restraint or does not subserve the public welfare. The legislature is the judge in the first instance of whether a police regulation is necessary; judicial review is limited and even an earnest conflict of public opinion does not bring the question of necessity within the range of judicial cognizance."

In the case of Wanberg v. National Union F. Ins. Co. 46 N. D. 369, 179 N. W. 666, this court had before it for construction § 4902, Comp. Laws 1913, which provides that "Every insurance company engaged in the business of insuring against loss by hail in this state shall be bound, and the insurance shall take effect from and after twenty-four hours from the day and hour the application for such insurance has been taken by the authorized local agent of said company," and it was held, that this was a reasonable requirement. In affirming the decision of this court on appeal, 260 U. S. 71, 67 L. ed. 136, 43 S. Ct. 32, Judge Taft said: "The legislature was evidently convinced that it would help the public interest if farmers could be induced generally to take out hail insurance, and 'temper the wind' so injurious to the agriculture of the state; and that they would be more likely to avail themselves of this protection if they could effect the insurance promptly. . . .' " The legislature said, therefore, to companies intending to engage in the hail insurance: 'To accomplish our purpose we forbid you to engage in this kind of business unless you agree to close your contracts within twenty-four hours after application is made. You must so extend the scope of the authority of your local agents, or must so speed communication between them and your representatives who have authority, as to enable an applicant to know within the limits of a day whether he is protected; so that, if not, he may at once go to another company to secure what he seeks. If, therefore, you engage in exigent business, and allow an application to pend more than twenty-four hours, you will be held to have made the contract of insurance for which the farmer has applied.' "

It is pointed out on behalf of the company that the very application which the defendant in error signed contained an express consent that the policy should not take effect until the company's agency at Waseca, Minnesota, should have an opportunity to examine it and should accept it. It is clear that, if the statute is valid, such a consent is void, because

it defeats the very object of the statute. This is settled by Whitfield v. Ætna L. Ins. Co. 205 U. S. 489, 51 L. ed. 895, 27 S. Ct. 578; Orient Ins. Co. v. Daggs, 172 U. S. 557, 43 L. ed. 552, 19 S. Ct. 281."

In Holsman v. Thomas, 112 Ohio St. 397, 39 A.L.R. 760, 147 N. E. 750, the Ohio court upheld an ordinance providing, among other things, that no jewelry shall be sold at auction for a period greater than sixty days in one year, and that the auctioneer must have been a resident of the municipality for one year, and must have had a regular stock of jewelry for six months of that year, a valid enactment not in conflict with the provisions of article 1 of the constitution of Ohio, and article 14 of the Constitution of the United States.

In the case of Hutchinson Ice Cream Co. v. Iowa, 242 U. S. 153, 61 L. ed. 217, 37 S. Ct. 28, Ann. Cas. 1917B, 643, the court held as valid, "Laws forbidding the sale, offering for sale, etc., as 'ice cream' of any article not containing butter-fat in reasonable proportion." "The fact that the name 'ice cream' as commonly used, includes many compounds which are entirely wholesome, yet contain no cream or butter-fat, does not render such legislation arbitrary or unreasonable, but tends rather to support it as serving to prevent the public from being misled in the purchase of a food article of general consumption."

In the cases of Merrick v. N. W. Halsey & Co. 242 U. S. 568, 61 L. ed. 498, 37 S. Ct. 227; Hall v. Geiger-Jones Co. 242 U. S. 539, 61 L. ed. 480, L.R.A.1917F, 514, 37 S. Ct. 217, Ann. Cas. 1917C, 643; and Caldwell v. Sioux Falls Stock Yards Co. 242 U. S. 559, 61 L. ed. 493, 37 S. Ct. 224, the court had before it the "Blue Sky" laws of South Dakota, Ohio and Michigan, all of which were upheld. In the Merrick Case the court said: "But it is to be borne in mind that the policy of a state and its expression in laws must vary with circumstances. And this capacity for growth and adaptation we said, through Mr. Justice Matthews, in Hurtado v. California, 110 U. S. 516, 530, 28 L. ed. 232, 237, 4 S. Ct. 111, 292, is the 'peculiar boast and excellence of the common law.' It may be that constitutional law must have a more fixed quality than customary law, or, as was said by Mr. Justice Brewer, in Muller v. Oregon, 208 U. S. 412, 420, 52 L. ed. 551, 555, 28 S. Ct. 324, 13 Ann. Cas. 957, that 'it is the peculiar value of a written constitution that it places in unchanging form limitations upon legislative action.' This, however, does not mean that the form is so

rigid as to make government inadequate to the changing conditions of life, preventing its exertion except by amendments to the organic law. We may feel the difficulties of the new applications which are invoked, the strength of the contentions and arguments which support or oppose them, but our surest recourse is in what has been done, and in the pending case we have analogies if not exact examples to guide us. So guided and so informed, we think the statute under review is within the power of the state. It burdens honest business, it is true, but burdens it only that under its forms dishonest business may not be done. This manifestly cannot be accomplished by mere declaration; there must be conditions imposed and provisions made for their performance. . . . 'Can the occasional fraud, that fraud which arises in the individual transaction, justify a law regulating the business of which the single transaction is a part? Or must it be fraud which is incidental to the business, a fraud which the business itself, from its character and manner in which it is generally conducted, invites and encourages?' And, quoting from People ex rel. Tyroler v. Warden, 157 N. Y. 116–123, 43 L.R.A. 264, 68 Am. St. Rep. 763, 51 N. E. 1006: 'It is a novel legislation indeed that attempts to take away from all the people the right to conduct a business because there are wrongdoers in it.' To the latter we say the right to do business is not taken away; the other we have already answered and need only add that we cannot upon such consideration limit the power of the state. The state must adapt its legislation to the evils as they appear and is not helpless because of their forms." Engel v. O'Malley, 219 U. S. 128, 55 L. ed. 128, 31 S. Ct. 190; Allen v. Riley, 203 U. S. 347, 51 L. ed. 216, 27 S. Ct. 95, 8 Ann. Cas. 137; Brazee v. Michigan, 241 U. S. 340, 60 L. ed. 1034, 36 S. Ct. 561, Ann. Cas. 1917C, 522; Brodnax v. Missouri, 219 U. S. 285, 55 L. ed. 219, 31 S. Ct. 238.

In the case of Otis v. Parker, 187 U. S. 606, 47 L. ed. 323, 23 S. Ct. 168, article 4 of § 26 of the Constitution of California providing, that all contracts for the sale of shares of the capital stock of any corporation or association, on margin, or to be delivered at a future day, shall be void, and any money paid on such contracts may be recovered by the party claiming it by suit, was upheld as not in conflict with the 14th Amendment, although the provision may be construed to apply to bona fide as well as to gambling contracts.

In the case of State v. Prince, 77 N. H. 581, L.R.A.1916A, 950, 94 Atl. 966, a law forbidding the sale or exchange, under penalty, of any animal unfit for labor was upheld. Briefly stated, the due process clause of the Federal Constitution is not intended to interfere with the power of the state in the exercise of its police power, to prescribe regulation for the protection and promotion of the welfare of the people. Property and liberty are held on such reasonable conditions as may be imposed by the governing power of the state in the exercise of those powers and with such conditions the 14th Amendment was not designed to interfere. It is, however, subject to the qualification that the measures adopted for the purpose of regulating the exercise of the rights of liberty and the use and enjoyment of property must be designed to affect some public object which the government may legally accomplish, that they must be reasonable and have some direct, real and substantial relation to the public object sought to be accomplished and that the governmental power is not to be arbitrarily or colorably exercised or used as a subterfuge for oppressing some individual or class of individuals.

We are of the opinion, that chapter 238 of the Session Laws of 1919 is a reasonable regulation of the sale of certain kinds of farm machinery; that it is designed to affect a public object and has a real and substantial relation to the public object sought to be accomplished. The record in this case shows that four "combines" were sold at the same agency, on the same day to four different men in the same neighborhood; that all had the same trouble; that none of the machines were reasonably fit for the purpose for which they were purchased, and we must assume from the enactment of the law with its declaration "that all contracts contrary thereto, are void as against public policy," that there was a widespread demand for the enactment of the law as a police regulation for the protection and promotion of agriculture in the state, and it is not in conflict with the due process clause of the Constitution of the United States or the constitution of North Dakota.

Appellant's next contention is that the defendant did not rescind in a reasonable time even under the statute.

A case very much in point is the case of Dwinnell v. Boehmer, 60 N. D. 302, — A.L.R. —, 234 N. W. 655. In this case we held, "The defendant might waive his right to rescind on condition that the tractor

be made fit, and when this was not done he still would have the right to rescind provided he exercised it seasonably. See Williston, Contr. § 1526."

Under the statute, chapter 238 of the Laws of 1919, the plaintiff had a reasonable time for the inspection and testing of the machine. What would be a reasonable time, in testing and determining whether a harvester combine was reasonably fit for the purpose for which it was purchased, would be an unreasonable time in the testing of some simple machine. It is a matter of common knowledge that a harvester combine is an intricate, complex machine which cuts, threshes and sacks the grain, and was something new in the harvesting of grain at that time. The record shows that the plaintiff had no experience with, and had never used such a machine. He had to rely largely on the instructions and assistance of the defendant's experts and agents. The record shows that he had trouble from the beginning. New holes had to be drilled in some parts of the machinery before it could be put together and made to fit. With the experts there working the machine it would break down three or four times in a round. The plaintiff took the matter up with the agent at Richardton within three days from the time the machine was first used as a combine and the general agent at Fargo promised to send an expert but did not until more than a month later which would certainly be an unreasonable time in the harvest season. There was such a loss of time in repairing and delay in the operation of the machine that plaintiff went back to his binder and employed Mr. Madison to cut a goodly portion of the crop with an International Combine. Clearly the jury might well find from the record that the machine was not reasonably fit for the purpose for which it was purchased. The plaintiff, after repairs were made on the machine by the defendant in 1929, started to cut on the 10th or 11th of August. He had the same trouble that he had the year before and on the 21st of August he quit using the machine and offered to bring it in and return it to Mr. Eskestrand and when Mr. Eskestrand refused to accept it he told him where it was and it would be at his disposal. It also appears from the record that he notified Mr. Malmo at the Fargo office by letter on September 4th, 1929.

We are of the opinion that it was a question of fact for the jury to determine whether the rescission was made within a reasonable time

after determining that the machine was not reasonably fit for the purpose for which it was purchased and it was submitted to the jury under proper instructions. Appellant specified as error the admission of plaintiff's exhibit 9, the letter notifying the defendant of defects in the machinery on the ground that the letter is signed by three other different parties. If the letter had been signed by Bratberg alone it would certainly be admissible as a statement showing notice to the defendant of the defects in the machine which he purchased. There were four machines all of the same kind ordered and came to Richardton in the same shipment. Each of the parties signing the statement purchased one of the machines. Each of the parties had the same troubles. Walter Hamann had been sent down to the Fargo office as a representative of the others, prior to the writing of the letter. Statements had been made to the plaintiff and the others that these machines would be rebuilt and this statement describes the parties which were necessary to be replaced before the machine could be used. Instead of writing four different statements they made and each signed the one statement. It is a statement of the defects in plaintiff's machine. It was admissible to show that defendant had notice of such defects. The appellant further contends that the court erred in the admission of evidence of other alleged warranties and representations not contained in the written contract. The court permitted the plaintiff to prove what the agent of the company at the time of the sale said regarding the machine purchased and before the signing of the contract. It is the contention of the plaintiff that this evidence was admissible to show that the defendant knew at the time of the sale the purpose for which the plaintiff was buying the combine, and in order to prove this knowledge on the part of the defendant the plaintiff testified to conversation which took place between him and the agent as to the character of the farm the plaintiff had, its extent, the character of the crops it was raising, the size and power of the combine, how much it would cut per day and whether it would operate on rolling land of the character of plaintiff's farm. The plaintiff admits the contract of warranty, except in so far as it is modified by chapter 238 of the Session Laws of 1919, both as to the statutory warranty of reasonable fitness and the effect of the provision in the contract limiting the period of rescission to a reasonable time. These provisions of the

statute are a part of and must be read into the contract. Dwinnell v. Boehmer, 60 N. D. 302, — A.L.R. —, 234 N. W. 655; Minneapolis Steel Machinery Co. v. Casey Land Agency, 51 N. D. 832, 201 N. W. 172; Allis-Chalmers Mfg. Co. v. Frank, 57 N. D. 295, 221 N. W. 75; Minneapolis Threshing Mach. Co. v. Hocking, 54 N. D. 559, 209 N. W. 996; Palaniuk v. Allis-Chalmers Mfg. Co. 57 N. D. 199, 205, 220 N. W. 638, 640. The testimony was admissible to prove that defendant knew the character of plaintiff's land and the purpose for which the combine was purchased. It was not limited to this purpose in the instruction, but no request for such limitation was made, and therefore there was no error in the admission of the testimony. The appellant next contends that the court erred in refusing to give the following instructions, viz.: "I instruct you that parties to this action by their written contract agreed upon an expressed warranty with reference to such machinery and that this excluded the other expressed, implied or statutory warranty of quality or fitness or capacity of the goods described in such contract. This request was too broad. It asked the court to charge the jury that the contract excluded all statutory warranties of fitness and this was erroneous. Where a request for an instruction contains an erroneous statement of the law it is proper for the court to refuse to give it. Grant v. Whorton, 28 S. D. 599, 134 N. W. 803. The defendant relied on two theories, viz.: that chapter 238 of the Session Laws of 1919 was unconstitutional, and, second, that even if constitutional the parties had a right to contract as to what was a reasonable time, and having so contracted and the plaintiff not having rescinded within the time specified, he had lost his right to rescind. The court charged fully and fairly on these questions and if more explicit instructions were desired requests for the same stating correct principles of law should have been made. Landis v. Fyles, 18 N. D. 587, 120 N. W. 566; McGregor v. Great Northern R. Co. 31 N. D. 471, 154 N. W. 261, Ann. Cas. 1917E, 141.

The judgment is affirmed.

Christianson, Ch. J., and Nuessle and Burr, JJ., concur.

Birdzell, J. (dissenting). The statute in question does not treat contracts for the sale of the described machinery as being evil in them-

selves or detrimental to the public interests. They are not regarded as wrongful or as in any way related to a business that may be limited or prohibited, nor is there any attempt to limit or prohibit sales. The statute applies to sales of machinery that has been in common use, not only upon farms but elsewhere, for several generations. It applies to sales whether the machinery is new or secondhand, whether sold by one individual to another, or by the manufacturer, manufacturer's agent, a dealer, or by a casual owner who might have occasion to dispose of but one such machine in a lifetime. It does not purport to compensate for inequalities of position as between vendor and purchaser, for it applies as well to a situation in which the purchaser may have knowledge of the capacity of the machine to fulfill the purpose for which he buys it superior to that of the seller. It imposes a contract upon the parties which both may be unwilling to make, and it does so without regard to whether or not the contract so imposed is necessary to prevent fraud or to place the parties upon an equality in dealing with each other. The statute on its face is an assumption of legislative control over all sales of machinery of the kind designated despite the action of the parties (see Chicago, B. & Q. R. Co. v. Mc-Guire, 219 U. S. 549, 55 L. ed. 328, 31 S. Ct. 259) and establishes a policy with reference to such transactions to the effect that no sales shall be made unless accompanied by warranties of fitness for the breach of which rescission must be allowed. I do not question the power of the legislature to make any reasonable regulation to compensate for inequalities of position—particularly as regards knowledge of capacity—as between vendor and purchaser, and in doing so to classify vendors with respect to their actual or presumed superior knowledge of the capacity of machines they may be selling; nor do I question the power of the legislature to make reasonable regulations for the purpose of preventing fraud in the marketing of machinery as well as other products. But under the decisions interpreting the 14th Amendment to the Federal Constitution, as I understand them, all such regulations must be reasonably adapted to the legitimate end in view; otherwise, they amount to arbitrary restrictions upon the liberty of contract. I do not question that legislation securing to purchasers of warranted machinery a reasonable time within which to test it would be such a reasonable regulation, but I can see no more

reason for denying to all purchasers and sellers of ordinary staple machinery the right to contract deliberately concerning warranties of fitness and the character of the remedy for breach than for denying them the right to contract regarding the price. The fact that a number of persons may have been too easily persuaded to buy a corn husker before it had been so perfected as to be ordinarily practicable would hardly justify the extension of a statutory right of rescission, in spite of his contract, to an experienced contractor who had been unfortunate in his own selection of a donkey hoisting engine. I see in the legislation no attempt at classification for the purpose of reaching and correcting any particular evil, but an assumption of control throughout a wide range of contracts without regard to whether they are characterized by common or similar experiences.

### (On Petition for Rehearing.)

BURKE, J. In a petition for rehearing appellant states that under chapter 238, Session Laws 1919, "it was competent for the parties to agree that during the period of trial the buyer if he found the machinery defective would notify the seller of that fact. Also that the seller would be afforded an opportunity to visit the machine and remedy the difficulty and if unable to do so would be entitled to substitute a new article for the one found to be defective or to take back the goods and return the price." We do not hold that the parties could not so contract as under the facts in this case it was not necessary to pass on that question. The respondent, together with appellant's expert, started to operate the machine on the 10th day of August, 1928. The expert could not make the pickup work and after coming to this conclusion the pickup was taken off and on the advice of the expert they tried to operate it as a combine. After starting the combine the expert left and respondent operated the machine as a combine for three days cutting in the three days ten or twelve acres or at the most four acres a day. Then, within three days after the machine had been started as a combine, the respondent notified Mr. Eskestrand, the agent from whom respondent purchased the machine, that the machine would not work and Mr. Eskestrand called Mr. Malmo (by telephone), general manager of the Fargo Agency, and he promised to send experts as soon as possible. Eskestrand advised respondent to go back home and

get along the best he could. Respondent could not make the machine work, laid it aside and commenced to harvest his crop with his binder. In the meantime he went several times to the agent at Richardton, telling him that the experts had not come and that he wanted to return the machine. Every time he went to Eskestrand, Eskestrand would call up Malmo at Fargo, and he would promise to send an expert. On one occasion Malmo said that the experts were busy; he did not know when he could get one but he thought it would be very soon. On the 6th day of September, nearly a month after notice to appellant, respondent wrote to the company at Fargo. To this letter Malmo wrote an answer in which he claimed they didn't have any notice, but it is clear from the evidence that he did have notice, that he had authority to furnish experts, and that he promised to send experts, and yet Malmo, general manager of the North Dakota agency, knowing all the time that the machine was defective, and having notice within three days from the time the machine was first tried as a combine and failed to work, did not send an expert until about the 15th of September, just about a month after they had received notice. Respondent's letter to the Fargo office is dated September 6, 1928, but Malmo did not answer it until September 11th. The appellant had actual knowledge and notice and was the first to breach the contract in not sending experts to repair the machine in a reasonable time. The record further shows that in the fall of 1928 promises were made to respondent by appellant's agent that the machine would be rebuilt. Appellant's experts detached and took away parts of the machine and Eskestrand went with the respondent and Jesperson, Zimmerman and Hamann (who had the same trouble with their combines) in the spring of 1929 to Fargo, a distance of three hundred miles, to see Malmo, as Eskestrand said: "To get the matters ironed out." At that meeting the record shows that Malmo agreed to put the machine in working order. He did furnish repairs and sent an expert on the 10th or 11th of August, 1929, but the expert could not make the machine work and respondent rescinded the contract. Dwinnell v. Boehmer, 60 N. D. 302, — A.L.R. —, 234 N. W. 655. Respondent was at all times willing and anxious to give friendly assistance to experts and no doubt would have been glad to accept a machine that would work in place of the one that would not work as he had 450 acres of crop to cut, but he never had

the opportunity to accept a substitute. The furnishing of a substitute machine was optional with the appellant and if appellant did not or would not furnish a substitute the respondent could not compel him to. Skeen v. Springfield Engine & Thresher Co. 34 Mo. App. 485.

There is no merit in the contention that the payment of the notes precludes recovery or rescission. Respondent refused to pay the notes and appellant had the sheriff seize the respondent's crop under a mortgage. Bratberg testified: "I said to Church at the time I paid the sheriff (Church was appellant's collecting agent), they got the mortgage and rather than have my crop tied up I would pay up and deal with the company afterwards."

Under § 5844, Comp. Laws 1913, an apparent consent is not real or free when obtained through duress. St. Anthony & D. Elevator Co. v. Bottineau County (St. Anthony & D. Elevator R. Co. v. Soucie) 9 N. D. 346, 50 L.R.A. 262, 83 N. W. 212.

In Harris v. Cary, 112 Va. 362, 71 S. E. 551, Ann. Cas. 1913A, 1350, the court said: "To constitute 'duress' it is sufficient if the will be constrained by the unlawful presentation of a choice between comparative evils, as inconvenience and loss by the detention of property, loss of property altogether, or compliance with an unconscionable demand." Irving v. Wilson, 4 T. R. 485, 100 Eng. Reprint, 1132; Valpy v. Manley, 1 C. B. 594, 135 Eng. Reprint, 673; Lamborn v. Dickinson County, 97 U. S. 181, 24 L. ed. 926; Alston v. Durant, 33 S. C. L. (2 Strobh.) 257, 49 Am. Dec. 596; Wooters v. Smith, 56 Tex. 198; Clark v. Pearce, 80 Tex. 146, 15 S. W. 787; Lovejoy v. Lee, 35 Vt. 430; Stevenson v. Mortimer, Cowp. pt. 2, p. 805, 98 Eng. Reprint, 1372; Maxwell v. Griswold, 10 How. 242, 13 L. ed. 405; Elliott v. Swartwout, 10 Pet. 137, 9 L. ed. 373; Robertson v. Frank Bros. Co. 132 U. S. 17, 33 L. ed. 236, 10 S. Ct. 5; DeBow's Case, 11 Ct. Cl. 672, affirmed in United States v. Norton, 97 U. S. 164, 24 L. ed. 907; Chase v. Dwinal, 7 Me. 134, 20 Am. Dec. 352; Briggs v. Lewiston, 29 Me. 472; Boston & S. Glass Co. v. Boston, 4 Met. 181; Ripley v. Gelston, 9 Johns. 201, 6 Am. Dec. 271; Grim v. Weissenberg School Dist. 57 Pa. 433, 98 Am. Dec. 237.

The petition for a rehearing is denied.

CHRISTIANSON, Ch. J., and BURR, and NUESSLE, JJ., concur.