[File No. 5953.]

INTERNATIONAL HARVESTER COMPANY OF AMERICA, a Corporation, Appellant and Respondent, v. M. C. OLSON, Respondent and Appellant.

(243 N. W. 258.)

Opinion filed April 23, 1932.   Rehearing denied June 9, 1932.

*McIntyre & Burtness* and *Charles A. Verret,* for appellant-respondent.

258

*J. J. Kehoe,* for respondent-appellant.

BURR, J. The defendant purchased a McCormick-Deering combine with attachments, agreeing to pay $2,140.50 and the freight therefor, and to secure the payment of a portion of the purchase price gave a chattel mortgage on the property purchased and other personal property. Two actions were commenced—one in claim and delivery to secure possession of the mortgaged chattels, and the action to foreclose the mortgage when a proceeding to foreclose by advertisement was enjoined.

The complaint is the usual one showing the giving of the mortgage, default in payment, etc., and asks for judgment of foreclosure for the amount still due on the purchase price.

The answer admits the execution of the notes and mortgages, and alleges the combine was purchased for the cutting of grain and threshing same, which purpose was well known to the plaintiff, and upon the warranty that it was well made and of good material; that "the defendant relied upon the skill and judgment of the plaintiff to furnish defendant machinery reasonably fit for the aforesaid purpose for which the defendant purchased said machinery;" that he relied upon the warranty and was hereby induced to give the written order for machinery, purchase the combine, execute the notes and mortgage, and pay freight thereon amounting to $210.00; that the combine did not do the work for which it was warranted, neither plaintiff nor the defendant could make it of any service, it was not reasonably fit for the purpose for which it was purchased and has no value; that plaintiff induced and encouraged the defendant to keep possession of the machine in unsuccessful attempts to make it work and upon the promise that it would make it good; that in reliance upon such promises and efforts he retained said machine for some time, but upon the plaintiff failing to make the machine of any service he gave notice of rescission of his contract, demanded the return of his notes and returned the combine to the plaintiff. The defendant therefore asks for the return of his notes and mortgages and the amount which he paid for freight.

The defendant claims: that fraud was practiced on him in the matter of the execution of the notes and mortgages; that the machinery was not as warranted; that he rescinded the contract; that under the law there was an implied warranty the machinery was reasonably fit for

the purpose for which it was purchased; and that there was a breach of such warranty.

The two actions were consolidated and tried to the court as one action.

The trial court found that the plaintiff knew the purpose for which the machinery was purchased; that defendant relied upon the knowledge and judgment of the plaintiff in purchasing the machine; that the combine did not do and could not be made to do satisfactory work; that the machine was not reasonably fit for the purpose for which it was purchased; that the combine itself was of no value when purchased, but would have been worth the price agreed upon if it was as warranted; that the attachments purchased with the combine were worth the agreed price; and that the defendant had not rescinded his contract.

The court gave plaintiff judgment for $367.16—the price of the attachments—instead of the amount of the purchase price on the contract remaining unpaid. Thus the defendant was required to pay this amount, lost the amount of freight which he had advanced, and failed to secure the cancellation of his notes and mortgage. From the judgment rendered by the trial court both parties appeal demanding a trial de novo.

The allegations in the action for claim and delivery are ignored because the issues are involved in the action to foreclose the chattel mortgage.

The findings of the trial court in an equity case are not clothed with the same presumption of correctness where trial de novo is demanded as in a jury case where a jury is waived. Anderson v. Resler, 57 N. D. 655, 665, 223 N. W. 707.

As usual in such cases there is a conflict of testimony on some material matters and as each case depends peculiarly upon its own state of facts it is useless to set forth the evidence in detail.

The defendant is a farmer, experienced in the handling of machinery, and at one time was engaged in the business of selling farm machinery.

Mr. Leppert, a machinery dealer at Sarles says: he handled International goods in 1928, that one Mr. Fraley "a traveling salesman for the International Harvester Company" came to him and told him the

defendant "was a prospect for a combine;" and the two of them went out to Olson's place.

Later, in Leppert's office, an order for the machine was given, the important portion of which reads as follows:

"To F. E. Leppert                  Dated July 27th, 1928.
     Dealer.

...................................

The undersigned, hereinafter called the "Purchaser," of R. F. D. No. .... Twp. ........, P. O. Sarles, County Cavalier State of N. D. hereby orders of you, subject to all provisions and conditions hereof and of the agreement and warranty printed on the back hereof, to be shipped to F. C. Leppert at Sarles, N. D. on or about at once 192.., the following described.

> Order .......... McCormick-Deering Harvester-Threshers, viz.: No. 11, McCormick-Deering 16 ft. Combined Harvester-Thresher (with Tractor Hitch) complete with Auxiliary Engine, Straw Spreading Attachment and either .......... as ordered. (Indicate whether Sacking Attachment or Wagon Loader is wanted.) at $1,953 each ..................................... To be delivered F. O. B. Chicago, Illinois. In consideration whereof, the Purchaser agrees, at the time of the signing of this order by him, to execute and deliver to you a bankable deposit note, payable to your order, for $250 due Sept. 1st, 1928, with interest at 8 per cent from date 1928, to receive said property on arrival, pay freight and charges thereon from Chicago, and upon delivery or tender thereof to execute and deliver to you approved bankable notes, payable to your order, as follows: One note for $840 Due Oct. 1st 1928 and one for $1,089, Due Oct. 1st 1929 with interest at 8 per cent from date of delivery and to secure such notes as follows: one flax attachment ............ 22.50

One 16 ft. swath ............................ 357.00

One 7½ Pickup attachmt ....................... 95.00

Credit one 10 ft. McD power binder one 8 ft. McD horse binder ................................... 384.00

Subject to a 5% discount if paid by Oct. 1st 1928

60 bushel grain tank (For No. 11) ................. 97.00

The Purchaser understands and agrees that this order, together with the warranty and agreement on the back hereof, contains the entire agreement with reference to the purchase of the above property and that it is taken subject to the approval of the Seller. The Purchaser acknowledges receipt of correct copy of this order.
By Wm. Fraley Salesman    , M. C. Olson Purchaser."

On the back of the order appear this "agreement" and this "warranty:"

## "AGREEMENT.

"1. If this order is not approved, all advance payments will be refunded and if the Purchaser should refuse to accept delivery of the machine or machines herein ordered, the initial payments made or to be made as above provided, may be retained or recovered by the Seller as liquidated damages.

"2. The title to the property sold hereunder shall remain in the Seller until the entire purchase price and all notes given therefor have been paid in cash, but said property, after delivery to the Purchaser, shall be held at his risk and expense in respect to loss or damage from any cause, and taxes and charges of every kind.

"3. The Seller will use his best efforts to ship the machines herein ordered on time, but is not to be responsible for delays in transportation nor for failure to ship on time when prevented by strikes or fires or by the demand exceeding the available supply or by any other cause beyond his reasonable control."

## "WARRANTY.

"The Seller warrants each machine herein ordered to be well made and of good materials and, in full satisfaction of said warranty, agrees to furnish and the Purchaser agrees to accept, free of charge except for freight or express and charges from factory, a new part to replace any part which breaks or proves defective with proper use during the first season's use (except canvases and belting on which no warranty is given), provided the defective part is returned to the Seller and a new part requested within that time; and provided, further, that the

Seller shall in no case be liable hereunder for more than the cost of such a new part or parts.

"The Seller further warrants and guarantees that each machine will do good and serviceable work if properly adjusted and operated by a competent person. The Purchaser agrees to give each machine a fair trial as soon as possible after receiving same and within one day after its first use, and if it then fails to work well with proper handling, to give the Seller written notice within three days after said trial, stating the nature of the trouble, and allow a reasonable time for the Seller to send a competent man to examine it, and the Seller shall then be allowed a reasonable time to remedy the trouble (the Purchaser agreeing to render necessary and friendly assistance) and may at its option substitute new parts or a new machine. If the Seller fails to send a man or if the machine as then adjusted, repaired or replaced, still fails to fulfill the warranty, the Purchaser shall decide within five days thereafter whether to keep it or return it and if he desires to return it, he shall give the Seller immediate written notice, tender back the machine at the place where delivered to him and request the refund of the purchase price, repayment of which shall constitute a settlement in full. The Seller assumes no liability hereunder, either to put the machine in good working order or to take it back, unless such trial is made and such notices are given within the time specified. Failure to give such notices or use of the machine for more than one day or continued retention of possession shall be considered an unconditional acceptance and a fulfillment or waiver of all warranties and no assistance rendered by the Seller in operating any machine or in remedying any actual or alleged defects, either before or after said trial period, shall waive or excuse failure by the Purchaser to comply with said conditions.

"The Seller shall in no case be responsible for any trouble caused by careless or improper handling by the Purchaser and all expenses incurred by the Seller in remedying such trouble shall be paid by the Purchaser.

"As the character or quantity of work done may vary under different conditions, no warranty is given on any machine of serviceability for particular purposes or persons, and it is understood that the above warranty of good and serviceable work refers to use for general farm

264.

purposes or other purposes for which the machine may be designed under ordinary and average conditions.

"It is agreed that this order shall be divisible as to each machine and attachment for which a separate price is named, and the failure of any article to fill the warranty shall not affect the liability of the Purchaser for any other article offered.

"No agent of the Seller has any authority to alter or add to the above printed warranty and agreement either before or after the signing of this order or to waive compliance therewith at any time, and the Purchaser understands and agrees that there are no oral or implied warranties, and that said machine or machines are sold subject to the above printed warranties and no other, and that the Seller is to be wholly discharged of liability thereunder in case the Purchaser fails to settle and pay for the property herein ordered promptly and in accordance with the terms of this order, and that in no event is the Seller to be liable for breach of warranty in an amount exceeding the purchase price of the defective article."

It is clear from this contract, therefore, that F. E . Leppert was the one designated as "seller" and the defendant is the "purchaser," even though the evidence shows there was a private arrangement between the purchaser and the seller regarding the latter's commission from plaintiff.

Mr. Fraley took the order in the name of Leppert. While there is nothing indicating the contract was ever sent to the International Harvester Company or that the Company ever saw it—no "approval" by the Company appears on it—nor is it shown how Leppert ordered the machine from the company; nevertheless the plaintiff recognized Leppert as its dealer, consigned the machine to him, charged it to him on its books; the notes and mortgage given for the purchase price—made out on blanks furnished by Mr. Lillo "block man for the International Harvester Company"—were made to Leppert and by him assigned to the plaintiff without recourse. These notes were computed and prepared by Mr. Lillo, after considering the commission to be paid Leppert, and in compliance with the terms of the contract, and Leppert had them in his possession "just long enough to endorse them." The plaintiff must be charged with knowledge of the terms and conditions of the order, the consideration for the notes, and defendant's right to

avoid them even though the complaint in the foreclosure action is based on the theory the transaction was between defendant and Leppert, and plaintiff claims to be "the owner and holder of said promissory notes in due course." The contract was in fact made by plaintiff's representative, for the benefit of plaintiff, and the plaintiff shipped the combine in accordance with the terms of the order, and to fill the order.

The defendant received the machine on August 11, 1928, the date he paid the freight bill—$210.00. He had one thousand acres of crop to harvest and did not start to use the machine until the 23rd of August. At that time two men, said to be experts from the company, were at the defendant's place to start the machine. They began working on the machine at nine o'clock and worked all day. From the very first the machine was unsatisfactory and the experts were doing their best to make it work. The machine was pulled into the yard that night, Saturday night, and on Monday morning these same two experts appeared to attempt to make the machine work satisfactorily. That day the defendant telephoned to the head office of plaintiff at Grand Forks and received a message that others would be sent out. These others came two or three days later and remained a part of two days trying to adjust the machine. They were unsuccessful and left telling the defendant to go ahead and do the best he could and they would come back. They returned with another person, and again the defendant telephoned to the head office and received word that another man would come out. This man came, worked a while and said he could not fix it. By this time the machine was pulled into the yard. Later some of the former men came back and wanted to take the machine out into the rye, and try it again. They worked with it for several hours and pulled it back into the yard, saying that they could not fix it but for the defendant to "go ahead and finish up, the company will send somebody here to fix it." Defendant kept on testing the machine for about two weeks when a man came to attempt to collect on the notes and again the defendant was told to go ahead and do the best he could and there would be another man to fix it. All in all the defendant tested the combine on about 400 or 500 acres of the land,—though representatives of the company say he told them he used it on over six hundred acres—and complained of the heavy and unnecessary waste of his grain—testifying to as high as four bushels of barley to the acre.

The remainder of the crop was cut with binders and threshed by ordinary machinery.

The defendant pulled the machine into the yard. He did not use it again but went to Leppert to find out where he wanted the combine delivered, telling him he had cancelled his contract "because the machine would not work," and would "deliver the machine to him." Leppert did not specify any place, but asked him to wait a few days and a man from the company would come out and tell where to deliver it.

Some time later two men came, they had with them the notes and tried to make an adjustment. At that time the defendant agreed to pay for the swather and windrower and some of the other improvements, if certain gears were replaced. Under the terms of the contract the attachments were bought as if there was a separate contract for each and the defendant had no objection to the attachments nor did he offer to rescind as to them. These men representing the company wanted him to pay for the use of the machine and apparently all agreed that $2.50 per acre was a fair price though one placed it at $3.00 per acre; but the defendant wanted an off-set because of the waste of his grain. The parties could not come to an agreement on such basis and left, returning later to attempt again to make an adjustment.

These men were notified by the defendant that he had rescinded the sale, had tendered back the combine to Leppert, that he did not claim it, and they could do anything they liked with it. The defendant asked them where they wanted it to be delivered, and they asked him if it could be stored on his place. In November, 1928, to another collector defendant said he would put it in the shed for them.

About the first of August of the next year some of the same men returned to attempt adjustment and collection, and again there was discussion with regard to the attachments and an attempt was made to repair the windrower.

Finally when the collectors could not make an adjustment they said they would take in the machine under the chattel mortgage and send the sheriff for it. The defendant told them it was not necessary for the sheriff to come, he would haul it for them himself, provided his notes were returned.

. A claim and delivery action was commenced and plaintiff took possession of the machine.

It was not until after Olson had notified him the contract was cancelled that Leppert told him he was not an agent for the company for that purpose. Plaintiff claims however, that it was understood by the defendant at the time he purchased the machine that Leppert's name was used only for "handling this deal and draw up a net to the company;" but it is clear Mr. Leppert got a commission on this deal and he admits "I didn't come out and tell him point blank I held a contract for this heavy line, I remember I led him on to believe I had the International line and that was included." We are satisfied from the evidence that the order was given to Mr. Leppert, that he received a commission for it, that the company recognized him as its agent on this deal and that it was from Leppert as "seller" the defendant received the combine, therefore he was the one to whom under the contract Olson had a right to tender it back.

It is clear, if we accept the foregoing as the truth of the matter—and the evidence preponderates this way—the machine never worked from the start; that the defendant never accepted it; that he gave it a fair trial, and notified the person from whom he purchased the machine that he had rescinded his contract. It is true he did not bring it back to Sarles, but he did place it at the disposal of the seller. The time taken in the use of the machine and delay in placing it at such disposal were all caused by the action of the plaintiff itself or its representatives. It is true there are provisions in the contract requiring the giving of written notice which notice was not given in this case—the notice being oral—but our statute does not require written notice. It requires notice to be given to the "agent who negotiated the sale or made delivery of such personal property."

Under the statute, § 5991a of the Supp., which has been considered and construed by this court in the cases of Minneapolis Threshing Mach. Co. v. Hocking, 54 N. D. 559, 209 N. W. 996; Palaniuk v. Allis-Chalmers Mfg. Co. 57 N. D. 199, 220 N. W. 638; Allis-Chalmers Mfg. Co. v. Frank, 57 N. D. 295, 221 N. W. 75; Dwinnell v. Boehmer, 60 N. D. 302, 234 N. W. 655; Kramer v. K. O. Lee & Son Co. 61 N. D. 28, 237 N. W. 166; Bratberg v. Advance-Rumely Thresher Co. 61 N. D. 452, 78 A.L.R. 1338, 238 N. W. 552; Holden v. Advance-Rumely

Thresher Co. 61 N. D. 584, 239 N. W. 479, the defendant was entitled to a reasonable time after the receipt of the machine in order to see whether it was fit for the purpose for which it was purchased, and the warranties contained in the contract recognize this fact. Under the contract, if the purchaser rescinded as required by law he was to give "the seller immediate written notice, tender back the machine at the place where delivered him, etc." The statute involved says: "The purchaser may rescind the sale by giving notice within a reasonable time after delivery to the parties from whom any such machinery was purchased, or the agent who negotiated the sale or made delivery of such personal property, or his successor, placing the same at the disposal of the seller." Section 5993a of the Supp. says that "any provision to the contrary is void."

We have held in the numerous cases cited that such statute is controlling and binding.

The plaintiff's claim that it is the "owner and holder of said promissory notes in due course" cannot be upheld so as to defeat defendant's rights. The case is tried on the theory that the International Harvester Company was the "seller," despite the language of the contract itself, and the objection of the plaintiff "that the machine was not bought from the plaintiff."

Plaintiff says these several representatives had no authority other than as experts or collectors, and therefore any notice to them is not notice to it; but we hold that under the contract and the statute notice to Leppert was sufficient.

Under the terms of the contract the notice of rescission was not required to be given to the International Harvester Company but to the "seller." Both purchaser and seller admit notice was given, and defendant placed the machine at the disposal of the seller. He is therefore entitled to the return of his notes, under consideration hereinafter noted, and the repayment of the freight bill paid.

From the evidence in this case we are satisfied the defendant rescinded the sale within a reasonable time after obtaining possession of the combine, and the decision of the lower court is reversed in this respect.

It becomes unnecessary therefore to pass upon the question of fraud in the securing of the notes.

Though the defendant is not required to pay for the combine he is required to pay for the attachments. Each was bought on the separate contract. There was no rescission as to them, and the evidence shows he was satisfied with them and agreed to retain them. Hence the decision of the lower court is affirmed in this respect.

It is the decision of this court that the contract was rescinded, and the defendant is entitled to a refund of the freight bill, but is required to pay for the attachments in accordance with the contract price, and the judgment will be modified to accord with this decision.

CHRISTIANSON, Ch. J., NUESSLE, BIRDZELL and BURKE, JJ. concur.

## (On Petition for Rehearing.)

BURR, J. Plaintiff asked for rehearing on four points as follows:

"1st. The Court has failed to give due consideration and weight to the findings and memorandum opinion of the trial court in holding that the defendant Olson rescinded the contract under which he purchased the machinery involved.

"2nd. The Court holds that the defendant Olson placed the machinery involved at the disposal of the seller, which conclusion is not supported by the evidence.

"3rd. The Court in holding that the alleged rescission on the part of Olson was made within a reasonable time after the purchase of the machinery has, we believe, failed to give due consideration to the evidence bearing on this question.

"4th. Conceding the right of Olson to rescind, such rescission did not go to the individual and separate attachments to the combine and the plaintiff would therefore be entitled to recover for all of those attachments which were not shown to be defective."

In the main opinion we refer to the weight to be given to the findings of the trial court.

Points two and three are based upon the evidence and we see no reason for a further review thereof.

Point four overlooks the latter portion of the opinion wherein we hold the defendant "is required to pay for the attachments." The trial court found for the defendant, but on a theory different from the one adopted by this court, and apportioned the amount of the commission

270

and freight chargeable to the attachments. We do not set this out in the main opinion, but in order there may be no misunderstanding this court finds and determines that the defendant must pay for all of the attachments in accordance with the contract price, together with the freight thereon in the proportion determined by the trial court, and also pay the proportionate share of the agent's commission.

The petition for rehearing is denied.

CHRISTIANSON, Ch. J., NUESSLE, BIRDZELL and BURKE, JJ. concur.