**UNION PIPE & MACHINERY, Ltd.,**
**Appellant,**
**v.**
**LURIA STEEL & TRADING CORPORA-**
**TION, Appellee.**
**LURIA STEEL & TRADING CORPORA-**
**TION, Cross-Appellant,**
**v.**
**UNION PIPE & MACHINERY, Ltd.,**
**Cross-Appellee.**
**Nos. 12297, 12298.**

United States Court of Appeals
Sixth Circuit.
Sept. 20, 1955.

Robert M. Hammond, Youngstown, Ohio (Maurice F. Hanning, Cleveland, Ohio, on the brief), for Luria Steel & Trading Corp.

Harold K. Bell and James S. Pedler, Jr., Cleveland, Ohio (William M. Nelson, Jr., Cleveland, Ohio, on the brief; Spieth, Spring & Bell, Cleveland, Ohio, Rudenko & Gross, Montreal, Canada, of counsel), for Union Pipe & Machinery, Ltd.

Before SIMONS, Chief Judge, and MARTIN and STEWART, Circuit Judges.

STEWART, Circuit Judge.

Union Pipe & Machinery, Ltd. (hereinafter called Union), a Canadian corporation, brought this action in the district

court against Luria Steel & Trading Corporation (hereinafter called Luria), an Ohio corporation, for damages growing out of Union's purchase from Luria of a quantity of steel tubes. The complaint was based upon a claimed breach of an express warranty that the material sold was seamless tubing. Luria filed a counterclaim for breach of contract. From the district court's judgment awarding Union a partial recovery, both parties have appealed.

In 1947 when this controversy arose Luria was a dealer in scrap steel and Union a dealer in new and used pipe and tubing. In May of that year one of Union's buying agents, a Miss Pins, having heard that Luria had some war surplus steel tubes for sale and having ascertained that one of Union's customers was in the market for seamless steel tubing, telephoned Luria's office in Cleveland. In this conversation Luria's agent, a Mr. Schachtel, confirmed the fact that Luria did have approximately five hundred tons of tubes for sale, but he told Miss Pins that, the material having been originally made for Bailey bridges for the Army, the tubes had attachments at each end. Schachtel said the material was for sale at $50 a ton. Miss Pins told Schachtel that before she could decide on the purchase she would have to inspect the material to determine how much waste or scrap there was on the ends of the tubes.

Accordingly, Miss Pins went to Cambridge, Ohio, where the material was stored, and there met by arrangement a representative of Luria who took her to the storage yard. The tubes were piled in bundles, containing from five to nine tubes apiece. Each bundle was framed with a wooden form on each end. Immediately in front of the stacked bundles there were two broken bundles of fourteen tubes, and the Luria representative assisted her in measuring the dimensions of the attachments on their ends. At her request he also removed the paint from a part of one of the tubes. She was in the storage yard not more than three-quarters of an hour.

The evidence was clear that Miss Pins was interested in buying only seamless tubing. However, while some of the material in the storage yard at Cambridge was seamless tubing, a great deal of it was butt weld pipe and a small quantity of it was lap weld pipe, both of substantially lower value than seamless tubing. The evidence showed that butt weld pipe is rather difficult to distinguish from seamless tubing, but that an experienced observer can readily distinguish lap weld pipe. The Luria representative testified that he knew that the material at the storage yard in Cambridge was not all seamless tubing, but both he and Miss Pins testified that the question of whether or not the material was all seamless tubing was not discussed by them. Whether because of a careless inspection, or because the fourteen tubes actually inspected were in fact all seamless, Miss Pins did not realize that all the material at the storage yard was not seamless tubing.

The next day Miss Pins went to Luria's Cleveland office, where she talked with Schachtel. She advised him that she thought the attachments on the ends of the tubes would present no problem. She also testified that she told Schachtel that the material had to be seamless because it was going to a customer for redrawing purposes, and that Schachtel assured her that the material was all seamless tubing. Schachtel repeated that the price for the tubing would be $50 a ton, and stated that Luria would require that a $25,250 deposit accompany the purchase order if Union decided to buy the material.

Miss Pins then returned to Canada, and, after arranging to sell the tubing to Union's customer at $55 a ton, sent a telegram to Schachtel stating: "Cannot Get Through By Phone. Am Buying Tubes. Will Call Tomorrow Morning." Miss Pins did not call the following morning, but four days later sent another telegram stating: "Mailing Cheque And Purchase Order, Air Mail, Special Delivery, Monday Morning." On the following Monday Union sent Luria its

purchase order for the tubes, accompanied by its check for $25,250. The tubes were described in the purchase order as follows: "4″ OD Seamless Steel Tubing ¼″ wall, 8′7″ in length, including attachments, as seen and accepted by our Miss Pins." Before acknowledging the purchase order, Schachtel made certain language revisions as to weight and price formulations and also added the War Assets Administration's coded description of the tubes. These modifications clarified but did not in any way vary the terms of the order. Schachtel then signed and returned the order to Union.

About a month later the first nine freight cars of the material arrived in Welland, Ontario, where they were inspected by a representative of Union's customer to whom they had been consigned. It was immediately apparent to him that the tubing was not all seamless, but largely butt weld and lap weld, and Union was promptly notified of that fact. Accordingly, that same day, Union's president telephoned Luria and sent Luria a letter stating:

"Further to our telephone conversation of even date, we wish to advise you that the 4″ tube you shipped us is not in accordance with our Order No. 1226, namely 'seamless,' which you signed and acknowledged. Our Miss Pins' function was purely to examine the fabrication and condition of these tubes, which she did. The Mill in Welland, Ontario, has rejected this material as it is not seamless. We are therefore holding these cars in bond for your instructions, and any and all freight and demurrage will be charged to your account. Please guide yourself accordingly."

Two days later Luria sent Union the following telegram: "Material Shipped Is Exactly As Inspected And Accepted By Your Agent We Are Holding Balance Of Material Pending Your Determination." Subsequently Miss Pins and Schachtel had several telephone conversations. Miss Pins testified that in these conversations it was finally agreed that Union would take and pay for at the contract price all the seamless tubing contained in the nine-car shipment, that Union would endeavor, as Luria's bailee, to arrange for the sale of the butt weld and lap weld pipe at the highest available price, but would assume no other obligation with respect to it, that Luria would take responsibility for stopping the remainder of the shipment in transit, and that Union would be relieved from any obligation with respect thereto.

After the last of these telephone conversations, Luria sent Union a telegram reading in part: "Confirming Our Telephone Conversation Today * * * You Are To Handle The Nine Cars Delivered We Are To Handle The Seven Cars In Transit * * * The Equities Are To Be Worked Out And Determined When The Material Is Disposed Of." The same day Luria stopped the remaining seven freight cars of the material in transit at Buffalo, New York, and arranged for its sale in that city at a gross price of $44 per net ton, Luria paying all demurrage, switching, and reconsignment charges.

That same evening Union sent a telegram to Luria, as follows: "Must Have Confirmation Immediately That The Nine Cars Of Tubing At Welland Can Be Unloaded And Segregated As To Seamless Lapweld And Buttweld Contract Price To Stand For Seamless Price On Buttweld And Lapweld To Be Arranged Please Wire Confirmation Immediately Cars On Demurrage." Not having received a reply to this telegram, Union sent Luria another telegram the following day as follows: "We Have Decided In The Best Interests Of All Concerned To Ship The Nine Cars Now In Welland Back To You And To Absorb Part Of The Freight On Same Which We Will Adjust Please Let Us Have Your Shipping Instructions No Later Than Monday Noon Letter Following." On the following Monday Luria sent Union a telegram reading in part: " * * * Our Wire 27th Confirmed Agreement You Are To Handle The Nine Cars De-

livered Welland Stop Handle Them In Your Own Way We Will Handle Balance * * * And Work Out Equities Based Upon Original Contracts."

Thereafter Union sent Luria a letter stating that:

"When we originally sent you our wire advising you that we thought it best to ship the nine cars in Welland back to you, we were of the opinion then, as now, that it would be the best and most reasonable way out of our difficulties. However, since you insist that we unload and segregate the material we are doing so. The Seamless will be segregated and weighed, and paid you according to our contract. The Buttweld and Lapweld will be adjusted, however, at a much lower price."

Union then succeeded in selling the butt weld and lap weld pipe at $40 a ton and so notified Luria. Thereafter, a statement of the segregation and sale of the nine carloads in question was communicated to Luria. In this accounting, Union charged Luria with all freight, duty and demurrage costs of the lap weld and butt weld pipe, and credited Luria with the amount of seamless tubing in the shipment at the contract price and with the amount of the lap weld and butt weld tubing at $40 a ton. This resulted in a claim by Union for the return of over $15,000 of its $25,250 deposit. Luria did not return any part of the deposit, nor did it further communicate with Union.

This litigation ensued, in which Union demanded not only the return of a portion of its deposit as above computed, but also damages for loss of profits. In its counterclaim Luria averred that it had fully performed or tendered performance of its contract of sale by shipping the specific goods seen and accepted by Miss Pins, and sought damages for Union's alleged breach of its contract to purchase the material at $50 per ton.

In a lengthy opinion, later designated as findings of fact and conclusions of law, the district court concluded that there was no warranty that the material sold was seamless tubing. Schachtel had died prior to the trial, and the court did not credit Miss Pins' testimony that Schachtel had made an oral express warranty. The court further concluded that the phrase "seamless tubing" in the purchase order did not constitute a written warranty, because the contract of sale had been made and the goods accepted prior to the execution of the purchase order, and because the language "as seen and accepted by our Miss Pins" "effectively withdraws any implication of warranty from the descriptive designation." The court concluded that the contract of sale was complete when Miss Pins sent the telegram stating, "Am buying tubes," and that the goods had previously been accepted by Union. However, the court further concluded that at the time of the contract the parties shared the mistaken belief that the material was in fact seamless tubing, and that after this mutual mistake of fact was discovered, the parties, instead of rescinding the contract as they had a right to do, entered into a new agreement. The district judge did not credit Miss Pins' testimony as to the terms of this new agreement worked out in the telephone conversations with Schachtel, but, relying upon his conclusion that there had been no warranty, and upon his interpretation of the correspondence between the parties, decided that the parties had agreed that Luria should be placed in the position it would have occupied had it sold the mixed tubing at its fair market value f. o. b. Cambridge, Ohio. Accordingly, the court found that as to all of the material shipped to Welland, Union was entitled to an adjustment of the contract price downwardly to the fair market value of mixed tubing, but that Union was obligated to pay the freight, duty, and demurrage on that shipment. As to material shipped as far as Buffalo, the court found that Union was under no further obligation with respect to the material itself, it having been sold in Buffalo for its fair market value as mixed tubing, but that Union was obligated to pay the freight and demurrage

costs of that shipment. The court accordingly entered judgment in favor of Union in the amount of $7,087.44 with interest.

On this appeal the parties are agreed that the case is governed by the law of Ohio. That state has enacted the uniform sales act. Ohio Revised Code, § 1315.01 to § 1315.76.

The statute defines an express warranty as "Any affirmation of fact or any promise by the seller relating to the goods * * * if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon." Ohio Revised Code, § 1315.13. If the testimony of Miss Pins be accepted, it is clear that Schachtel in his conversation with her made an express oral warranty that the material was seamless tubing. However, the district court did not credit her testimony on this phase of the case. Although her testimony remained largely unrebutted, Schachtel having died prior to the trial, we cannot say that the district court's finding of no oral warranty was clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A., Quock Ting v. United States, 1891, 140 U.S. 417, 11 S.Ct. 733, 35 L.Ed. 501.

The question, however, of whether or not the words in the purchase order amounted to a written warranty is one of law. If the district court was correct in the conclusion that the purchase was completed when Miss Pins sent the "Am buying tubes" telegram, the court was also correct in concluding that the words "seamless tubing" in the purchase order did not amount to a warranty. If Union had already bought the tubes before the formal purchase order was sent, clearly the purchase was not made in reliance upon anything said in the order.

We cannot, however, accept the district court's conclusion that the purchase contract was completed upon the sending of the telegram. While the price for the material was apparently agreed upon during the conversation between Schachtel and Miss Pins in Cleveland, both Miss Pins and a witness for Luria testified that Schachtel stated in the conversation that Luria would require a deposit if the purchase was to be made. Since the required deposit was not sent at the time of the telegram, there was then no acceptance of any offer. See Restatement of the Law of Contracts, § 59. Nor did Union's sale of the material to its customer on that day constitute acceptance of any offer of Luria's. This was simply a short sale, in no way a manifestation of assent which created a contract with Luria.

We think rather the correct analysis to be that what Miss Pins ascertained in Ohio was that Luria had a quantity of steel tubes for sale at $50 a ton f. o. b. Cambridge, and that Union's offer for the tubes had to be accompanied by a $25,250 deposit. Her telegram was merely an expression of the intent of her company to make such an offer. That offer was made with the sending of the purchase order and accompanying deposit, and was accepted by Schachtel on behalf of Luria. We come therefore to the question of whether or not the words "seamless tubing" in the purchase order constituted an express warranty.

As stated by Williston, "The law * * * is now convincingly settled that descriptive statements do constitute a warranty, whether the seller makes them or whether the buyer in ordering goods makes them and the seller furnishes goods in response to such order." See 1 Williston on Sales, § 205 and cases collected in footnote 17. This general rule was recognized by the district court. However, in addition to finding that the purchase had been completed before the written purchase order was sent, the district court also relied on the exception to the general rule stated in the same section of Williston on Sales: "Doubtless a description of goods by the seller which taken by itself would amount to a warranty may be so qualified by other language as to be deprived of the effect that it would have if it stood alone."

We cannot agree with the district court the phrase "as seen and accepted

by our Miss Pins" so qualified the unambiguous description of the material as "seamless tubing" as to deprive that description of its effect as a warranty.

Giving effect to all the language of the purchase order, we think the phrase "as seen and accepted by our Miss Pins" operated to identify as the subject of the sale the specific tubes with attachments on their ends which Miss Pins had seen. On the other hand, the word "seamless" inserted in the purchase order by Union for its protection operated to state an attribute of quality concerning these specific goods. The two phrases served unrelated purposes and did not qualify each other. Thus viewed, the phrase "seamless tubing" retained its vitality as an express warranty.

Nor did the fact that Miss Pins actually had inspected the goods serve in any way to obliterate that warranty. As stated by the Ohio Court of Appeals in Schwartz v. Gross, 1952, 93 Ohio App. 445, 452, 114 N.E.2d 103, 107, " 'The buyer may rely on the affirmation of the seller rather than his own inspection where * * * the inspection fails to reveal to him defects, either because of their being latent and concealed or because of the buyer's inability to perceive and appreciate the defects from such inspection.' "

"There is no reason in the nature of things why a buyer should not rely both on the seller's statements and on his own judgment. Observation shows that buyers constantly do this, and accordingly it is generally and rightly held that inspection by the buyer does not excuse the seller from liability for words which amount to an express warranty, if the difference between the true condition of the goods and the seller's statements concerning them was not detected." 1 Williston on Sales, §§ 2–8. See Refinery Equipment, Inc., v. Wickett Refining Co., 5 Cir., 1947, 158 F.2d 710; Schlottman v. Pressey, 10 Cir., 1952, 195 F.2d 343.

When the nine-car shipment arrived in Welland, Ontario, and it was discovered that the goods did not conform to the warranty, Union's right to reject them was unaffected by the fact that title to the goods had passed to it when the cars had been loaded in Cambridge and that it had prepaid $25,250 of the purchase price. Lazarov v. Arnold Schwinn & Co., 6 Cir., 1950, 183 F.2d 673, certiorari denied 1951, 340 U.S. 932, 71 S.Ct. 494, 95 L.Ed. 672. Union could have accepted that part of the shipment which was seamless tubing and rejected the rest, or it could have rejected the whole shipment. Ohio Revised Code, § 1315.45. On the other hand, Union was free to accept the goods and, providing it gave Luria notice of the breach of warranty within a reasonable time, could have held Luria liable for damages. Ohio Revised Code, § 1315.50. If Union had chosen to reject the material, it would have been under no obligation to return it to Luria, but only to notify Luria of its refusal to accept. Ohio Revised Code, § 1315.51. Lazarov v. Arnold Schwinn & Co., supra, 183 F.2d at page 676. Depending upon what course Union chose to pursue upon discovery that the material was not all seamless tubing, the law gave Union several alternative remedies against Luria, including the right to rescind the contract of sale, and if Luria had refused to accept an offer to return the tubes, to hold them as Luria's bailee, with an immediate right to a return of its $25,250 deposit. Ohio Revised Code, § 1315.70. Wilson & Co. v. M. Werk Co., 1922, 104 Ohio St. 507, 136 N.E. 202, 24 A.L.R. 1438. If Union had chosen to rescind the contract of sale it would have been entitled to recover not only the price paid for the goods, but also its expenditures for freight, duty, and demurrage, in order to be restored to the *status quo*. See Brandtjen & Kluge, Inc., v. Shonka, 1954, 2 Utah 2d 223, 272 P.2d 155; J. L. Owens Co. v. O'Keeffe, 1918, 141 Minn. 275, 170 N. W. 204, 174 N.W. 224; International Harvester Co. of America v. Olson, 1932, 62 N.D. 256, 268, 243 N.W. 258, 263.

What Union actually did upon arrival of the shipment in Welland was promptly to notify Luria of the claimed breach of warranty and of Union's consequent refusal to accept the goods. In its responsive telegram Luria promptly notified Union of its position that there had been no breach of warranty and of its intention to hold Union to its contract to purchase the goods which Miss Pins had inspected. The parties consistently held to these respective positions throughout the subsequent negotiations and have continued to do so throughout the present litigation. That the issue between them was from the outset a close one is well illustrated by the differing conclusions reached by the district court and ourselves upon the question of whether or not there was an express warranty.

Throughout the subsequent exchange of correspondence each party was making a conflicting claim of legal right, and it is against that background that the nature of their negotiations must be understood. Against that background the scope of the new agreement which they reached is reasonably clear. Each of the parties obviously realized that there was some risk in the position it was asserting. It was therefore to their mutual interest to avoid unnecessary demurrage or additional freight charges. Although Union at first insisted on rescission, which would have involved the return of the shipments to Cambridge, the terms of the agreement eventually reached are summarized in Luria's final confirmatory telegram, "You Are To Handle The Nine Cars Delivered Welland Stop Handle Them In Your Own Way We Will Handle Balance * * * And Work Out Equities Based Upon Original Contracts." Union agreed to waive any claim it might have had for loss of profits on the material which was not seamless and undertook the responsibility of having the cars unloaded and the material segregated. Beyond that, the parties simply agreed to dispose of the butt weld and lap weld tubes as expeditiously as possible, each taking responsibility for selling a part of them, and afterwards

to settle upon the division of the burden of the loss, in the light of their relative rights and duties based upon the original purchase contract. That they were never able to agree on what their relative rights and duties were, this litigation has made apparent.

■ If there was a breach of warranty, as we have concluded there was, the relative rights of the parties are clear. Union was entitled to be relieved from any burden of loss resulting from the breach. It follows that Luria must be charged all freight, duty and demurrage on both the Welland and Buffalo shipments, except those costs attributable to that part of the Welland shipment which was in fact seamless tubing, and that Union is entitled to the return of its deposit, less the contract price of the seamless tubing it did receive and also less the amount received by it upon the sale of the butt weld and lap weld pipe in Welland.

The judgment of the district court is reversed and the case is remanded for proceedings consistent with the views expressed in this opinion.